UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALGONQUIN GAS TRANSMISSION, LLC,    ) ) | |
| Plaintiff,    ) ) | |
| v.    ) ) | No. _____ |
| 0.247 ACRES OF LAND. MORE OR LESS, ) IN LINCOLN. MASSACHUSETTS. and ) THE CITY OF CAMBRIDGE,    ) ) | |
| Defendants.    ) ) | |

## AFFIDAVIT OF CHARLES PEABODY

I, Charles Peabody, depose and state that I have personal knowledge of the following.

1.      I am employed by Enbridge Inc. as a Senior Project Manager. I am the Project Manager for the replacement of a meter station and related facilities (the "Project") appurtenant to the natural gas pipeline owned and operated by Algonquin Gas Transmission, LLC ("Algonquin"). As Project Manager, I am responsible for leading the Project team and am ultimately responsible for the cost and execution of the Project.

2.      Algonquin, which has its principal place of business in Houston, Texas, is a natural gas company as that term is defined by the Natural Gas Act, 15 U.S.C. § 717a(6). Algonquin is a wholly owned subsidiary of Enbridge Inc.

3.      On May 22. 1961, the Federal Power Commission issued a Certificate to Algonquin authorizing, among other things, the acquisition, operation and maintenance of approximately 18,752 feet of an existing 16-inch pipeline and related facilities in Waltham and Lincoln for purposes of transporting natural gas in interstate commerce. *See* 25 F.P.C. 1005 (1961). (A true copy of the Certificate is attached hereto as Exhibit A.) On September 30, 1987, FERC issued a blanket

certificate authorizing Algonquin to perform routine work on its system. *See* 40 FERC ¶ 62,398. (A true copy of the blanket certificate is attached hereto as <u>Exhibit B</u>.)

 4. Algonquin's pipeline interconnects with the Tennessee Gas Pipeline ("TGP") system in Lincoln to ensure reliable supplies of natural gas to the Greater Boston Area, including Cambridge.

 5. Algonquin needs to undertake a maintenance project at its existing interconnect with TGP to rebuild its existing meter and regulator site (the "M&R Site") located adjacent to Route 2 westbound. The M&R Site measures the volume of natural gas as it is transported from the TGP system to Algonquin's pipeline, using monitoring equipment that continuously measures the flow and regulates the pressure of gas as it moves between the systems. The M&R Site, installed in the early 2000s, is in need of replacement in order to ensure its continued safe operation and to provide an uninterrupted supply of natural gas to the area.

 6. The present M&R Site equipment is installed on a skid (a metal frame to which the equipment is secured) mounted on structural supports. It was installed in the early 2000s, replacing an older facility. The skid was originally intended to be temporary, anticipating the installation of a permanent facility. However, the equipment has continued to be used to the present.

 7. The M&R Site is now outdated and showing increasing signs of age. The wooden structural supports beneath the skid are particularly showing signs of deterioration due to continued exposure to the elements. As this facility ages, it will progressively lose reliability and safety. If the facility is not replaced in the near future, it will increasingly threaten the supply of natural gas to Cambridge and surrounding communities.

8.      The M&R Site is one of two facilities used by Algonquin to support the transport of natural gas to Cambridge when other sections of Algonquin's main line are out of service. It is used typically at least once per year during maintenance and related system outages.

9.      The intent for the Project is to install a permanent facility that will house enclosed meter and regulator facilities, making the facilities more weather resistant, increasing overall reliability and ensuring continued safe operation, and decreasing noise levels when the station is operating. Improvements will also include new security upgrades (i.e., higher security fencing and an alarmed Data Building).

10.     The M&R Site is located on land over which Algonquin holds permanent easement rights. To accomplish the Project, a temporary workspace easement ("TWS Easement") is required adjacent to the existing facilities, including adjacent land owned by the City of Cambridge and maintained for conservation purposes for the protection of the City's water supply. The City's ownership interest is more fully described in a deed recorded in the Middlesex South District Registry of Deeds in Book 59813, Page 111 (the "City Property"). A true copy of the above-referenced deed is attached hereto as Exhibit C.

11.     Algonquin requires the TWS Easement in order to safely transport its equipment onto and construct the new facility on the M&R Site, including the removal of trees to allow access for Algonquin's equipment. Accordingly, completion of the Project will require a temporary workspace easement comprising 10,766 square feet, or 0.247 acres of the City Property. The boundaries of the TWS Easement are depicted on the attached drawing # J-3-SYS-P-1000 dated April 14, 2024, attached as Exhibit D.

12.     Algonquin has engaged in discussions with the City (through the Cambridge Water Department) since June 2023 in an effort to purchase the necessary TWS Easement rights. The

3

City's primary concern has been to minimize the impact on trees on the City Property. In or about June 2023, the City granted Algonquin permission to enter the City Property to conduct survey activities, but admonished Algonquin to minimize impacts during the performance of those activities, including even limited-impact actions such as tree limbing.

13.     In the summer and fall of 2023, Algonquin worked to develop a plan for the Project that would minimize tree cutting associated with the Project, primarily by reconfiguring and reducing the initially planned Project footprint. Algonquin designed the new equipment to fit onto three extremely compact prefabricated skids, partially enclosed by a prefabricated building, which will result in one of the most compact sites the company operates. (A 3D rendering of the planned design of the new facility is attached hereto as Exhibit E.) The skids and structure would be lowered onto the site using a mobile crane located next to the M&R Site. Using prefabricated skids and a prefabricated structure instead of constructing the facility on site will reduce impacts on the site by shifting much of the required construction equipment and manpower offsite. To construct the facility on site, more temporary workspace would be required for activities like turning trucks around, and offloading and storing materials.

14.     Through the above efforts, the overall number of trees expected to be cut on the City Property as part of the Project was reduced from 72 to 55. Algonquin remains committed to using best efforts to further reduce the amount of tree removal to the extent feasible.

15.     Algonquin had multiple calls, presentations and on-site meetings with City officials to review its plans for the Project and attempt to address the City's concerns about the overall impacts and the extent of tree cutting in particular. At the City's request, Algonquin also prepared a robust alternatives analysis, reviewing six alternative approaches to the Project and recommending the

4

alternative with the least impact on the Project site. (A true copy of this alternatives analysis is attached hereto as Exhibit F.)

16.    Also at the City's request, Algonquin provided an in-depth written report addressing why its proposal to install its equipment on prefabricated skids and a prefabricated building would have materially less impact on the Project site than constructing the facility on-site. (A true copy of this report is attached hereto as Exhibit G.)

17.    Algonquin most recently discussed these efforts and reports with the City at a site visit on February 27, 2024. At that time, City officials indicated that they were not inclined to grant Algonquin a TWS Easement if even one tree on the City Property was to be cut.

18.    On April 25, 2024, Algonquin sent the City a final offer letter, proposing to purchase the TWS Easement for a 12-month term in exchange for a total payment of $10,000.00 (the "Final Offer"). (A true copy of the Final Offer is attached hereto as Exhibit H.) The amount of the Final Offer exceeded the appraised amount of the TWS Easement rights as determined by a licensed Massachusetts real estate appraiser and an independent forestry consultant, which appraisal reports were included with the Final Offer. The City did not accept Algonquin's Final Offer or make any counterproposal.

19.    The Project is scheduled to begin in July 2024 to ensure completion prior to the end of the year. Completing the Project by year-end is critical because the nature of the site will make winter work extremely challenging. The M&R Site's location, including a steep grade from Route 2 down to the site, will complicate access during winter weather conditions. Additionally, the proximity to Route 2 means the Massachusetts Department of Transportation ("MADOT") would likely not approve work during periods when the MADOT is conducting snow removal or other road work nearby. Finally, Algonquin has scheduled pipeline maintenance in 2025, during which the

5

M&R Site will be needed to provide an uninterrupted supply of natural gas to Cambridge and surrounding areas.

     20.     The total cost of the Project will not exceed $14,500,000.

     I state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April **30**, 2024.

Charles Peabody

6



25 F.P.C. 1005, 1961 WL 4295

ALGONQUIN GAS TRANSMISSION COMPANY,

DOCKET NO. CP61-159

FINDINGS AND ORDER ISSUING CERTIFICATE OF PUBLIC CONVENIENCE AND NECESSITY

May 22, 1961

**\*\*1   \*1005**  Before Commissioners: Jerome K. Kuykendall, Chairman; Frederick Stueck and Arthur Kline.

On December 6, 1960, as supplemented on January 25, 1961, Algonquin Gas Transmission Company (Applicant) filed in Docket No. CP61-159 an application pursuant to Section 7(c) of the Natural Gas Act for a certificate of public convenience and necessity authorizing the acquisition from Boston Gas Company (Boston Gas) and the operation of approximately 18, 752 feet of 16-inch pipeline, and appurtenances, on the outskirts of Boston, Massachusetts, all as more fully described in the application.

**\*1006**  The purpose of the proposed acquisition is to transfer to Applicant ownership of the subject section of pipeline, now owned and used by Boston Gas to transport natural gas received from Applicant at a delivery point on Applicant's 26-inch line in Waltham to a point in Lincoln, all in Massachusetts, for local distribution. Applicant intends to establish a fifth emergency interconnection with the transmission system of Tennessee Gas Transmission Company (Tennessee) at a point where the subject 16-inch pipeline crosses Tennessee's 24-inch line in Lincoln.

Applicant also proposes to construct and operate, during emergencies only, a short section of 12-inch pipeline to connect its Waltham Meter Station directly to the subject section of 16-inch line. The Waltham Meter Station Station is now connected to the 16-inch line by a section of 8-inch line owned and operated by Boston Gas in its normal distribution activities to transport gas taken from Applicant at said Waltham Station to the subject 16-inch line and thence to the Lincoln area. No change in the present use of the 8-inch and 16-inch lines is proposed following acquisition of the 16-inch line by Applicant as contemplated under the instant application, except that Applicant will operate the 16-inch line. In case of emergency, Applicant will use its new 12-inch line to bypass Boston Gas's 8-inch line, so that Applicant's gas can flow from its Waltham Station directly to the connection with Tennessee's system in Lincoln, or Tennessee's gas can flow by the same route directly to Applicant's system in Waltham. Thus, during emergencies, Boston Gas's 8-inch connection would be closed off and no emergency gas deliveries to Tennessee would flow through any of Boston Gas's facilities. It is stated that an estimated 85,000 Mcf per day of emergency gas could be delivered in either direction through the subject 16-inch line and bypass.

Applicant will pay the estimated $22,900 cost of the proposed 12-inch bypass line, and the $65,000 cost of acquisition of the 16-inch line from Boston Gas, from retained earnings. Boston Gas proposes to pay for a tap to connect the 16-inch line to Tennessee's system at Lincoln and a tap to connect said 16-inch line to Applicant's proposed 12-inch bypass line at Waltham, and also to pay for a relocation of the 16-inch line near Waltham required by a widening of highway Route 128, all at an estimated cost of $22,177.

**\*\*2**  Authority to install and operate the proposed taps to connect the subject 16-inch line to Applicant's and Tennessee's systems, to construct and operate Applicant's proposed 12-inch bypass line, and to make emergency deliveries between the two systems is included in the authorization granted to Tennessee's predecessor on November 8, 1950, in Docket No. G-18267 (Docket No. G-1248, *et al.*, 9 FPC 271) and to Applicant on August 6, 1953, in Docket No. G-1319 (Docket No. G-1319, *et al.*, 12 FPC 209).

The subject proposal will add to the security and continuation of service to the customers of the companies involved in cases of emergency.

Pursuant to due notice, a public hearing was held in Washington, D.C., on May 9, 1961, respecting the matters involved in and the issues presented by the application herein. No petition to intervene or protest to the granting of the application has been

received. Staff counsel moved orally at the hearing that the intermediate decision procedure be omitted and that the Commission render a decision herein pursuant to Section 1.30(c)(1) of the Commission's Rules of Practice and Procedure.

*The Commission finds:*

(1) Applicant, Algonquin Gas Transmission Company, a Delaware corporation having its principal place of business in Boston, Massachusetts, is a 'natural-gas company' within the meaning of the Natural Gas Act, as heretofore found by the Commission in its order accompanying Opinion No. 206, issued **\*1007** February 27, 1951, in Docket No. G-1319 (Docket No. G-1447, *et al.*, 10 FPC 35).

(2) The facilities proposed to be acquired and operated by Applicant as hereinbefore described and as more fully described in the application, as supplemented, herein, will be used in the transportation and sale of natural gas in interstate commerce, subject to the jurisdiction of the Commission, and the acquisition and operation thereof by Applicant will be subject to the requirements of Subsections (c) and (e) of Section 7 of the Natural Gas Act.

(3) The acquisition and operation of the facilities as proposed by Applicant are required by the public convenience and necessity and a certificate therefor should be issued as hereinafter ordered and conditioned.

(4) Applicant is able and willing properly to do the acts and to perform the services proposed and to conform to the provisions of the Natural Gas Act and the requirements, rules and regulations of the Commission thereunder.

(5) Public convenience and necessity require that the general terms and conditions set forth in paragraphs (a), (b), (d) and (e) of Section 157.20 of the Commission's Regulations under the Natural Gas Act (18 CRF 157.20) should attach to the issuance of the certificate referred to in paragraph (3) above and to the exercise of the rights granted thereunder.

(6) Applicant should record the subject acquisition of facilities by the charge of $65,000 to Account 101, Gas Plant in Service, and, immediately following consummation of said acquisition, should submit to the Commission journal entries reflecting such recording.

**\*\*3** (7) A request during the public hearing by staff counsel for omission of the intermediate decision procedure herein was unopposed by any party of record and, not having been denied by the Commission, is granted pursuant to Section 1.30(c)(1) of the Commission's Rules of Practice and Procedure.

*The Commission orders:*

(A) A certificate of public convenience and necessity be and the same is hereby issued authorizing Algonquin Gas Transmission Company to acquire and operate the facilities hereinbefore described, as more fully described in the application, as supplemented, in this proceeding, upon the terms and conditions of this order.

(B) The general terms and conditions set forth in paragraphs (a), (b), (d) and (e) of Section 157.20 of the Commission's Regulations under the Natural Gas Act shall attach to the issuance of the certificate granted in paragraph (A) above and to the exercise of the rights granted thereunder.

(C) Applicant shall record the subject acquisition of facilities by the charge of $65,000 to Account 101, Gas Plant in Service, and, immediately following consummation of said acquisition, shall submit to the Commission journal entries reflecting such recording.

(D) Applicant shall acquire and commence operation of the facilities authorized herein within 8 months of the date of this order.

FEDERAL POWER COMMISSION
25 F.P.C. 1005, 1961 WL 4295

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.



Case 1:24-cv-11220-ADB   Document 1-3   Filed 05/07/24   Page 12 of 128

40 FERC ¶ 62,398, ALGONQUIN GAS TRANSMISSION..., Fed. Energy Reg....

**Fed. Energy Reg. Comm'n Rep. P 62398 (C.C.H.), 1987 WL 1561771**

Federal Energy Regulatory Commission Reporter

Copyright (c) 2018 CCH INCORPORATED, A Wolters Kluwer business. All rights reserved.

Federal Energy Regulatory Commission

Volume 40 (July-Sept. 1987)

Office Director Orders

Ruling: Order

September 30, 1987

# 40 FERC ¶ 62,398, ALGONQUIN GAS TRANSMISSION COMPANY, DOCKET NO. CP87-317-000

**40 FERC ¶ 62,398, Algonquin Gas Transmission Company, Docket No. CP87-317-000**

**Algonquin Gas Transmission Company, Docket No. CP87-317-000**

**[63,675]**

**[ ¶ 62,398]**

**Algonquin Gas Transmission Company , Docket No. CP87-317-000**

**Order Issuing Certificate Authorizing Routine Activities and Approving Abandonment**

**(Issued September 30, 1987)**

**Richard P. O'Neill, Director, Office of Pipeline and Producer Regulation.**

On April 30, 1987, Algonquin Gas Transmission Company (Applicant) filed in Docket No. CP87-317-000 an application, as amended on July 20, 1987, pursuant to Section 7 of the Natural Gas Act to obtain a blanket certificate of public convenience and necessity authorizing certain routine activities and permission and approval to abandon such service and facilities specified in Subpart F of Part 157 of the Commission's Regulations, all as more fully set forth in the application, as amended.

Order No. 234 [*FERC Statutes and Regulations, Regulations Preambles 1982-1985* ¶ 30,368 ] established a blanket certificate and abandonment program which permits Applicants to obtain a one-time certificate of public convenience and necessity to authorize a variety of jurisdictional activities and permission and approval to abandon, which would otherwise require separate certificate or abandonment authority in each instance. Under the authorization issued to Applicant herein, Applicant will be authorized to conduct many routine activities and abandon facilities and service on a self-implementing basis without further

authorization by the Commission.[1] For other categories of activities,[2] which may potentially require more scrutiny and opportunity for public participation, this authorization is subject to the notice procedure specified in section 157.205.[3] Both categories of activities have been shown to serve the public interest; and for the reasons stated in Order No. 234 a certificate and abandonment authorization will be issued to Applicant to authorize the specific activities, subject to the procedural and reporting requirements of that order.

Currently, Applicant does not perform a jurisdictional off-system sale or storage service. Therefore, before Section 157.210 off-system sales or 157.213 storage service may be provided by Applicant, applicable rates must be established.

For the reasons discussed in Order No. 234 , and in the Environmental Assessment issued on July 1, 1981, the activities authorized by this certificate do not constitute a major Federal action significantly affecting the quality of the human environment.

After due notice by publication in the *Federal Register* on May 18, 1987 (52 Fed. Reg. 18,602), Central Hudson Gas & Electric Corporation, New Jersey Natural Gas Company, Orange and Rockland Utilities, Inc., and the Algonquin Customer Group (ACG) filed timely motions to intervene.[4] No further motions to intervene, notices of intervention or protests to the granting of the application have been filed.

In its motion, ACG requested the Commission to condition authorization granted herein to require Algonquin to serve on each of the ACG members all filings made by Algonquin pursuant to the prior notice requirements in Subpart F of Part 157 of the Commission's Regulations. ACG withdrew its request on September 8, 1987, in a letter filed with the Commission.

At a hearing held on September 30, 1987, there was received and made a part of the record in this proceeding all evidence,

**[63,676]**

including the application, as amended, submitted in support of the authorization sought herein.

*Pursuant to authority delegated by 18 C.F.R. § 375.307 , it is ordered:*

(A) Upon the terms and conditions of this order, a certificate of public convenience and necessity is issued authorizing Applicant to perform the activities specified in Subpart F of Part 157 of the Commission's Regulations, as amended from time to time.

(B) Upon the terms and conditions of this order, permission for and approval of the abandonment by Applicant of service specified in Subpart F of Part 157 of the Commission's Regulations, as amended from time to time, are granted.

(C) The certificate issued by paragraph (A) above, the abandonment authorized by paragraph (B) above, and the rights granted thereunder are conditioned upon Applicant's compliance with all applicable Commission Regulations under the Natural Gas Act, and particularly Section 157.20 and paragraphs (a) and (e) of Section 157.20 of such Regulations.

(D) Before Section 157.210 off-system sales or Section 157.213 storage service may be provided by Applicant, applicable rates must be established.

**-- Footnotes --**

1 *See* 18 C.F.R. § 157.203 (b).

2 *See* 18 C.F.R. § 157.203 (c).

3 Persons having a potential interest in such transactions are on notice to monitor the *Federal Register.* Once a deadline established under Section 157.205(d) passes without a protest being filed, the proposed activity is authorized under this order without further action by the Commission.

**40 FERC ¶ 62,398, ALGONQUIN GAS TRANSMISSION..., Fed. Energy Reg....**

4 Timely, unopposed motions to intervene are granted by operation of Rule 214.

**End of Document**                                                      © 2022 Thomson Reuters. No claim to original U.S. Government Works.



04



Bk: 59813 Pg: 111   Doc: DEED
Page: 1 of 4   08/22/2012 11:16 AM

# QUITCLAIM DEED

We, VICTORIA DEN. LOCHIATTO, TRUSTEE of the VICTORIA DEN LOCHIATTO REALTY TRUST, u/d/t dated February 10, 2003 and recorded with the Middlesex Registry of Deeds in Book 38613, Page 423, and THOMAS DENORMANDIE of Lincoln, Middlesex County, Massachusetts, KATHERINE DENORMANDIE MCCAREY f/k/a Katherine DeNormandie a/k/a Katherine B. DeNormandie of Lexington, Middlesex County, Massachusetts, VICTORIA DENORMANDIE LOCHIATTO f/k/a Victoria DeNormandie a/k/a Victoria L. DeNormandie of Harvard, Worcester County, Massachusetts, as tenants in common, for consideration paid and in full consideration of ONE MILLION NINE HUNDRED THOUSAND DOLLARS AND 00/100 CENTS ($1,900,000.00) grant to the CITY OF CAMBRIDGE, under the control of the Cambridge Water Board through its Chief Superintendent for the purposes of drinking water supply protection and land conservation, with an address of 795 Massachusetts Avenue, Cambridge, Massachusetts 02139,

with QUITCLAIM COVENANTS,

the land, together with the buildings thereon, situated in Lincoln, Middlesex County, Massachusetts being shown as "Lot A" on a plan entitled, "Plan of Land in Lincoln, Massachusetts" by Snelling & Hamel Associates, Inc., Professional Land Surveyors & Engineers, dated July 24, 2012, recorded herewith as Plan No. 572 of 2012, to which reference is hereby made for a more particular description of "Lot A".

Lot A containing 53.6 acres, more or less, according to said plan.

Said premises are conveyed subject to and together with any and all liens and encumbrances of record, insofar as the same are now in force and applicable.

The Grantors hereby certify that the premises hereby conveyed is not homestead property.

For title, see following deeds all recorded with the Middlesex South Registry of Deeds: deed dated February 10, 2003 and recorded in Book 38613, Page 427, deed dated September 8, 2003 and recorded in Book 41388, Page 578, deed dated December 19, 1975 and recorded in Book 12914, Page 604 and deed dated January 2, 1976 and recorded in Book 12926, Page 720.

JEFFREY L. ONTELL, ESQ.
MARSH, MORIARTY, ONTELL & GOLDER, P.C.
18 TREMONT STREET, SUITE 900
BOSTON, MA 02108

Property Address: 0 Cambridge Turnpike, Lincoln, MA

WITNESS our hands and seals this ___18___ day of August, 2012.


_Vdn lochiatt_
Victoria DeN. LoChiatto, Trustee of the Victoria
DeN LoChiatto Realty Trust


_VDeN lochiatt_
Victoria DeNormandie LoChiatto, Individually


## COMMONWEALTH OF MASSACHUSETTS

middlesex___, ss.

On this _18___ day of August, 2012, before me, the undersigned notary public, personally appeared VICTORIA DENORMANDIE LOCHIATTO,  proved to me through satisfactory evidence of identification, which was ___MADL_____, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that she signed it voluntarily for its stated purpose.

Laurie B. Maniachi
Notary Public
Commonwealth of Massachusetts
My Commission Expires
February 13, 2015

_Laurie B. Maniachi_
Notary Public:
My Commission Expires: 2 - 13 - 2015


## COMMONWEALTH OF MASSACHUSETTS

middlesex___, ss.

On this __18__ day of August, 2012, before me, the undersigned notary public, personally appeared VICTORIA DEN. LOCHIATTO, AS TRUSTEE OF THE VICTORIA DEN LOCHIATTO REALTY TRUST, proved to me through satisfactory evidence of identification, which was ____MADL_____, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that she signed it voluntarily for its stated purpose.

Laurie B. Maniachi
Notary Public
Commonwealth of Massachusetts
My Commission Expires
February 13, 2015

_Laurie B. Maniachi_
Notary Public:
My Commission Expires: 2 - 13 - 2015

_[signature]_

Thomas DeNormandie

## COMMONWEALTH OF MASSACHUSETTS

Middlesex , ss.

On this __18__ day of August, 2012, before me, the undersigned notary public, personally appeared THOMAS DENORMANDIE, proved to me through satisfactory evidence of identification, which was _Mass. Drivers License_, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he signed it voluntarily for its stated purpose.

Sally D. Hill
Notary Public
Commonwealth of Massachusetts
My Commission Expires
October 5, 2018

Notary Public: _Sally D. Hill_
My Commission Expires: _Oct 5, 2018_

*[signatures and acknowledgments continue on following page]*

_____
Katherine DeNormandie McCarey


COMMONWEALTH OF MASSACHUSETTS

_____, ss.

On this _____ day of August, 2012, before me, the undersigned notary public, personally appeared KATHERINE DENORMANDIE MCCAREY, proved to me through satisfactory evidence of identification, which was _____, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that she signed it voluntarily for its stated purpose.

_____
Notary Public:
My Commission Expires:

_Katherine DeNormandie McCarey_

Katherine DeNormandie McCarey

## COMMONWEALTH OF MASSACHUSETTS

_Barnstable_, ss.

On this _17th_ day of August, 2012, before me, the undersigned notary public, personally appeared KATHERINE DENORMANDIE MCCAREY, proved to me through satisfactory evidence of identification, which was _MA Drivers License_, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that she signed it voluntarily for its stated purpose.

Notary Public:

My Commission Expires: _March 7, 2019_





E



F

# Algonquin Gas Transmission, LLC
# Lincoln Meter Station Project
# Crane Deployment - Alternatives Analysis

Algonquin Gas Transmission, LLC ("Algonquin") is an interstate natural gas pipeline company with facilities which traverse the Town of Lincoln. As requested during the Zoom meeting held on December 18, Algonquin has investigated several potential locations for the crane needed to lower the required skids into the Lincoln meter station. Although three distinct components will be installed as part of the overall project, the alternatives analysis focused on the ability to lift the heaviest of the three components (i.e., Meter Skid) and used a typical weight for this analysis that is not expected to vary significantly. The company has experience with similar skids and used that experience as the basis for its analysis. In addition, Appendix C contains several photographs which depict a crane being used to move an identical Meter Skid into location at a similar project in Maine.

## Project Scope

Algonquin's project would replace the existing facilities in Lincoln adjacent to Rt. 2 in the vicinity of where that roadway is crossed by Hobbs Brook and which were put in place a number of years ago; pictures of those facilities appear in Appendix B. With the passage of time, the importance of these facilities to support the operation of Algonquin's J-3 system in providing gas supply to the Cambridge/Somerville/Medford area has increased significantly. The intent is to install a permanent facility that will house enclosed meter and regulator facilities, making the facilities more weather resistant, increasing overall reliability, and decreasing noise levels when the station is operating. Improvements will also include new security upgrades (i.e., higher security fencing and an alarmed Data Building). Work is scheduled to begin in July to ensure completion prior to the end of the year.

To accomplish the work, temporary workspace ("TWS") is required adjacent to the existing facilities to allow the work to proceed. A portion of the TWS will encompass the area where Algonquin and Tennessee Gas Pipeline ("TGP") presently have facilities; a limited amount of space owned by MassDOT is also involved. Additional TWS on property owned by the City of Cambridge Water Department is also required to facilitate construction.

## Method used to install existing skids

During the December 18 call, Algonquin was asked whether the method used to install the existing facilities could be followed, eliminating the need for a crane. As background, the new skids are larger than the one being replaced and critical components will now be in a weather tight, sound-mitigating enclosure;, critically, the new components are designed to be resilient and reliable over a long lifespan. The existing facility has the majority of its components exposed to the weather

and contains no sound mitigation. The new meter skids will also feature improved automation which will allow Algonquin to monitor in real time the quality of gas entering its system for delivery to its customers, system pressures, and automated valving which will provide the ability to remotely isolate its connection with TGP via Algonquin's 24-hr gas control operation should the need arise; these all represent significant operational and safety upgrades compared to the current facility.

The existing skid's installation method is believed to have consisted of being dragged into its current location. The existing skid is both smaller and lighter than the new skids being installed; additional equipment, a weather tight enclosure around the new skid; and the need for space inside the enclosure to perform maintenance contribute to the size increase. While the current design team does not know the reasoning that led to the dragging method with the original skid, our evaluation of this method concluded that attempting to "drag" the new skids into place would pose an undo risk to both the physical structure of the new skids which are appreciably larger and the components within the skids. Our construction team also determined that this method poses an unacceptable safety risk to the personnel performing the activity due to the steep slope involved in reaching the site. Algonquin does not believe that a repeat of the dragging method would follow its best practices of construction methods or safety. For these reasons, this option has been dismissed as an unacceptable construction method.

### Alternative Locations for the Installation of a Crane

Algonquin considered several locations within or adjacent to the proposed TWS for the crane to be situated in addition to the Company's preferred location. The various sites discussed below are reflected in Appendix A.

### Alternative 1 – Rt. 2 Proper

This site would occupy the two lanes of Rt. 2 Westbound and has the advantage of being the easiest to access since it is situated within the roadway. However, potential challenges include a long reach (i.e., need for a very large crane to move the skids from Rt. 2 to the meter station site), and the presence of a very steep highway embankment between the highway and the station, which requires the crane to reach over the existing gas facilities that are not being removed as part of this project. As part of its analysis, Algonquin consulted with its construction contractor and a local crane company to determine the feasibility of this option. The crane company anticipates that Alternative 1 would require a large, mobile crane that would have a deployed spreader distance of 31.5', with a 5' pad placed under each spreader, giving a minimum width of 36.5 feet (Algonquin's proposed location, Alternative 4B, would require a somewhat smaller, less intrusive crane). Alternative 1 would require a full shutdown of Rt. 2 West on a minimum of 3 occasions for at least 18-24 hours each to allow for the setup, breakdown, and lifting of the loads (Filter, Regulator, and Meter Skids; the existing facility will either be lifted out this way, requiring an additional shutdown of the highway, or broken down into pieces for removal, then scrapped). In addition, Algonquin is concerned that the edge of the steep bank adjacent to Rt. 2 would not support the crane footers; if the footers become undermined because the bank cannot support the weight, that could lead to a catastrophic result. This location would also place weight on the existing pipeline running

parallel to Rt. 2 and risk potential damage from the overburdened weight.  This site would also require lifting the loads over existing gas facilities that are not being replaced as part of this project. Based on its review, Algonquin determined that this option is not feasible for the crane setup due to the high consequence of the risk due to slope instability, the potential damage to existing gas facilities and the significant traffic disruptions on Rt. 2 itself.  In fact, the existing pipeline runs parallel to Rt. 2 which offers risk from the weight of the crane being placed at Alternative 1.



Photo shows the steep slope, TGP pipeline marker and edge of Rt. 2 West.



Depiction of Mobile Crane, specified by Crane Vendor that would be used for Alternative 1.

**Alternative 2 – Platform Construction North Side Rt. 2 West**

This alternative would involve building a level platform on the north side of Rt. 2 to support the crane during its operation. This concept would require the installation of a significant retaining wall to the south of the existing station. The entire space available to construct this alternative would be approximately 28 feet from the existing guard rail to the station fence. However, to construct the retaining wall required for this option, we would need an offset of a minimum of 15-ft from existing facilities (for access to construct and have a safety distance so existing facilities are not damaged during construction) which would allow only about an additional 20' width between the guardrail and the edge of the pad. A significant amount of earthwork would also be required for the foundation of the wall (all within the 100-wetland buffer) and this alternative would require that fill be brought in to fill in the 12' of elevation difference of the slope; an offset would be required from the crane's foot to the retaining wall making a few feet of the 20' created not useable. This option was dismissed due to the disturbance created and resulting environmental

impacts of the work within the 100' wetland buffer, the significant scope of the work to complete (increase in construction duration) and impacts to Rt. 2 during construction, and this alternative would still require a minimum of a lane closure on Rt. 2 for an extended period for construction and removal of the wall and when the crane is on-site. A full closure of Rt. 2 during the lifts would also be needed due to the crane's very close proximity to the travel lane. The required retaining wall would also need to be constructed over the TGP and National Grid pipelines exiting the station, and the overburden weight would likely not be acceptable to those companies over their pipelines (Algonquin standards would not allow us to approve the work over our pipelines). .



Topographical map of slope that would require retaining wall and fill adjacent to Rt. 2.

### Alternative 3 - East side Driveway

Placing the crane on the east side of the existing driveway off Rt. 2 was considered. The advantage of this site would be the placement of the crane off Rt. 2 with a reduced impact to traffic. However, this location involves an exceptionally long reach and would be very near the limits of any mobile crane. A pad area would also need to be constructed consisting of fill and trees would need to be cleared for the pad and swing radius of the crane. This would involve more tree clearing operations in an area that the current work plan does not require clearing and thereby increase the scope of construction. Placing the crane closer to the meter station such as Alternative 4B would involve fewer total trees being cut.

### Alternative 4A, next to meter station (east) - Tower Crane

Placing a tower crane next to the meter station would have the advantage of a smaller crane footprint (for the crane itself); however, this option was dismissed due to the extensive concrete foundation that would be required to support a tower crane. The significant disturbance required to create the foundation would block construction access around the site, and at the end of the project, a large concrete block would be left in place or require extensive efforts to remove. Tower cranes require a 360-degree swing radius and thus a significant amount of additional trees to the east of the existing proposed TWS would need to be removed. Constructing a tower crane is a significant effort adding significant duration to the project and would cause major ground disturbance. Tower cranes are typically deployed where they are used over a significant period or make lifts that exceed the abilities of other crane types. Due to the short duration of the crane's use for this project, this was assessed as highly impactful to ground disturbance, construction efficiency since site access would be blocked for weeks during construction and removal of the crane, unless a temporary access road was constructed to the east of the crane. This option would result in significant additional duration, tree cutting, and ground disturbance compared to Alternative 4B proposed at the same location.

**Alternative 4B, next to meter station (east) – Mobil crane**

This site would require the smallest mobile crane when compared to Alternatives 1, 2, 3 & 5, has the least impact to traffic on Rt. 2 and represents the preferred option.

This site would require some fill to be brought in to create a flat area for the crane but would place the crane closest to the station and have the weight of the skid during the lift closest to the cranes center of gravity, making this the safest alternative. In addition, the setup and breakdown of the crane would have minimal impact to Rt. 2 as it would occur off the highway. The swing radius of the crane can be limited to a roughly 180-degree arc to the west of the crane, thus requiring less trees to be cut than in Alternative 3. Appendix D contains the slide discussed during the December 18 call which depicts the TWS required from the Cambridge Water Department to support Alternative 4B.

**Alternative 5 (North of Site) – Mobile Crane**

This alternative was dismissed as it would involve at a minimum all the impacts of Alternative 4A plus additional impacts. For example, more additional workspace would be required then the current request would be needed for the crane to turn the corner from Alternative area 4 to 5. It would also require the larger crane of Alternative 1 to transit from Rt. 2 to Alternative location 5 (the larger the crane, the larger the potential disturbance). The lift of the skids would be with both the crane set at a significantly lower elevation then the elevation of Rt. 2 where the skids would be picked up from and involve the crane having to make a significant reach from its base to the skid. This situation would make for an awkward lift and create a significant potential safety concern. For all the above reasons, the feasibility of this lift was rejected since this alternative offers no advantages over Alternative 4B and requires additional workspace and contains additional challenges and risks.



Appendix B





Appendix C

Typical Algonquin Prefabricated Skid Meter Building

South Berwick, Maine, Fall 2022







Appendix D

Temporary Workspace Required from the Cambridge Water Department



**Off Skid Fabrication VS Stick Built on Site.**

Algonquin Gas's experience is that using prefabricated skids versus assembling and constructing the building on site (i.e., stick building) has such advantages such as using less workspace and has a shorter construction duration, thereby causing fewer total impacts.

Algonquin has significant experience with both methods historically and in recent years intentionally shifted to using prefabricated structures on smaller meter station sites such as the proposed Lincoln Interconnect when feasible.  Skid built fabrication shifts much of the work and the associated impacts from the project site to an offsite fabrication facility.  The benefits are such that material storage, welding, coating (i.e., sandblasting and painting), electrical and instrumentation, and hydrotesting and associated water discharge happen in a controlled facility away from the final site.  Moving these activities away from the job site also moves equipment and manpower associated with the stick-build technique away from the site and to the offsite fabrication facility.

Shifting more of the work to stick building on site would also require an expansion of the temporary workspace beyond the current request to support the assembly and construction processes by a minimum of 50 percent.  For example, the site as proposed is not large enough to turn a tractor trailer around in so there will be no efficient method to safely deliver the quantity of materials that will need to be delivered to the job site; in addition to this space additional room would also be required to off load the truck, while fabrication activities are concurrently occurring at the site. The site has an approximate 20-foot elevation difference between Rt. 2 and the lowest point of the site (see attached topographic map).  In addition to making a safe access from Rt. 2, the rear area of the site would need to be cut and filled to have a reasonably flat and safe work area for fabrication and storage of materials.  Using the current plan of prefabricated structures being installed, the temporary workspace as requested would be used largely for any soil storage, equipment storage (excavator, forklift, and only materials that are needed to connect the skids (i.e., pipe, supports, electrical materials, fencing)), and these materials would arrive on site just prior to the start of that installation activity.  In contrast, the stick-build approach would necessitate the need to bring in additional materials and personnel constantly to construct the facilities over a significantly longer period of time.

In addition to the expanded workspace, the duration of the project would be significantly longer.  The use of prefabricated skids anticipates a three-month construction window for mechanical activities.  Additional time would be needed to prepare the site, commission, and final cleanup/restoration.  As a result onsite fabrication would at a minimum double the length of construction.  Adding to the duration is the limited vehicle movement timeframes anticipated from the MassDOT.

**Typical Metering & Regulating (M&R) Station Project Workspace Areas:**

| Site | Station Site (acres) | Workspace (sq. feet) | Workspace (acres) |
|---|---|---|---|
| **Lincoln M&R Station** | **0.16** | **10,765** | **0.25** |
| Brockton M&R Station | 0.40 | 36,653 | 0.84 |
| Assonet M&R Station | 0.30 | 52,670 | 1.21 |
| Middleborough M&R Station | 0.80 | 25,812 | 0.59 |
| Wellesley M&R Station | 0.30 | 22,394 | 0.51 |
| Willimantic M&R Station | 0.20 | 47,891 | 1.10 |

**Note:**

**\* None of the comparison workspace projects have the access or terrain issues of the Lincoln site.**











**Typical Meter Station Laydown Area Photos**

**South Berwick, ME**



Equipment for site preparation  and foundations

Preparation for stick-built Heater Building

Pallets of material starting to arrive.



Laydown of Materials

Pipe Supports, prior to install.

Rich Hill, PA



Soil Storage/Drying



Equipment, soil                                        Aerial View of Site



Soil/Equipment, moving soil to allow workable access near pile.



**Site Topographic Drawing**



**Algonquin Gas Transmission LLC**
890 Winter Street, Suite 320
Waltham, MA  02451

April 25, 2024                                    <u>VIA UPS</u>

City of Cambridge
250 Fresh Pond Parkway
Cambridge, MA 02138

Attention:     Ann C. Roosevelt
               President, City of Cambridge Water Board

Reference:     Algonquin Gas Transmission, LLC Final Offer Letter
               J-3 System Meter Station Rebuild
               FERC Authorization 18 CFR 157.208
               AGT Tract Number J-3-MA-MI-J-3-8.1
               Tax Map 127, Lot 15 in the Town of Lincoln, MA

Dear Ms. Roosevelt:

Algonquin Gas Transmission, LLC ("Algonquin" or "AGT") is an interstate natural gas pipeline company regulated by the Federal Energy Regulatory Commission ("FERC"). Algonquin owns an existing natural gas pipeline in Lincoln, Massachusetts located in and adjacent to Route 2/Cambridge Turnpike, Old Colony Road and Trapelo Road in Lincoln and Waltham, Massachusetts. This pipeline interconnects with the Tennessee Gas Pipeline System (hereinafter "TGP") in Lincoln to ensure reliable supplies of natural gas to the Greater Boston Area, including Cambridge. Algonquin will be undertaking a maintenance project at its existing interconnect with TGP to rebuild its existing meter and regulation site (hereinafter "M&R site" or the "Project") located adjacent to Route 2 westbound at mile marker 126.4, roughly 1000' east of the intersection with Bedford Road in Lincoln. The M&R site is located within Algonquin's existing easement located on property owned by the City of Cambridge (hereinafter "City") as depicted on Tax Map 127, Lot 15 on the Tax Maps of the Town of Lincoln. Algonquin's existing easements pre-date the City of Cambridge's acquisition of the land in 2012. This maintenance work is authorized pursuant to 18 CFR 157.208 as an installation of ancillary pipeline facilities.

Starting on June 2023, Algonquin began communicating with the City about Algonquin's need to undertake this Project through written communications, personal contacts, telecommunications, and e-mails. In 2023, the City provided Algonquin with survey permission and over the summer and fall of 2023, Algonquin undertook the design of the Project. On December 18, 2023, Algonquin made a presentation to representatives of the City's Water Department who questioned our need for temporary workspace, asked questions about the loss of trees, asserted that our workspace was in the City's Zone A, and asked us to present a robust alternatives analysis.

On February 9, 2024, a follow-up meeting was held where Algonquin had the opportunity to provide the additional information requested by the City; at this meeting City officials indicated that the City had no desire to approve our TWS request. Since that time, Algonquin has undertaken actions to evaluate the value of the TWS required for the Project as well as the timber value of the trees which may need to be removed within the TWS to support construction activities within Algonquin's existing permanent easement. Note that Algonquin is committed (and will instruct its contractors) to minimize

disturbance to trees in the TWS to the maximum extent possible. However for purposes of its valuation, Algonquin assumes the maximum number of trees that it anticipates may need to be removed or disturbed. Copies of appraisals for the value of the TWS and the value of the trees to potentially be removed from the TWS are attached.

For your reference, attached to this letter is our proposed Temporary Workspace Agreement and drawing #J-3-SYS-P-1000, Rev. 2 dated April 14, 2024, depicting the location of the existing Algonquin pipeline easement, and proposed Temporary Workspace on the City's land. The amount of Temporary Workspace required for the Project is 10,766 S.F., or 0.2472 acres of land.

**Algonquin hereby offers FIVE THOUSAND DOLLARS ($5,000.00) for the Temporary Workspace required to complete this Project. In addition, Algonquin offers an additional FIVE THOUSAND DOLLARS ($5,000) for the timber value of the trees to be removed from the Temporary Workspace.**

This Offer expires at the close of business on May 1, 2024. If you accept this offer, please execute the attached temporary workspace agreement and Algonquin will issue a check to the City. If you decline this offer or fail to respond to our offer by the expiration date mentioned above, Algonquin will be compelled to initiate eminent domain proceedings in the appropriate U.S. District Court in accordance with the federal Natural Gas Act, 15 U.C.§717f(h) to obtain the temporary workspace. In the event of an eminent domain proceeding, Algonquin will provide the court with the appraised value of the property as the basis of determining the appropriate compensation for the temporary workspace to be acquired. We will only exercise this right as a means of last resort, and only if we are unable to reach a mutually acceptable agreement with the City.

Please be assured that Algonquin would like to reach an amicable agreement with the City regarding this matter and remains willing to discuss such a settlement, however time is of the essence, and we cannot delay the commencement of construction of this Project.

Sincerely yours,

Nancy A. Kist
Senior Advisor, Lands & ROW


cc:     Mark Gallagher, Managing Director, City of Cambridge Water Department
        David Kaplan, Watershed Manager, City of Cambridge Water Department

Enclosures:     Temporary Workspace Agreement
                Drawing # J-3-SYS-P-1000, Rev. 2 dated April 14, 2024
                Appraisal Report prepared by CBRE dated April 15, 2024
                Tree Valuation prepared by Woodsmen, Inc., dated April 5, 2024

Pipeline System: AGT J-3
Tract Number: J-3-8.1
Middlesex County
State: Massachusetts

## TEMPORARY WORKSPACE AGREEMENT

This Temporary Work Space Agreement ("Agreement"), dated _____, 2024, ("Effective Date") is between **City of Cambridge**, with an address of 250 Fresh Pond Parkway, Cambridge, Massachusetts 02138 (hereinafter "Grantor", whether one or more), and **Algonquin Gas Transmission, LLC**, a Delaware limited liability company with an address of 915 North Eldridge Parkway, Suite 1100, Houston, Texas 77079, and its successors and assigns (collectively referred to as the "Grantee"). For the consideration of TEN THOUSAND AND No/100 DOLLARS ($10,000.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantor does hereby give, grant and convey unto Grantee, its successors and assigns, subject to the limitations and reservations herein stated, the right to enter upon, use and occupy temporary workspace ("Temporary Workspace") located on certain property owned by Grantor ("Property"), as further described and depicted on the attached **Exhibit A**. Notwithstanding the foregoing, Grantee may install dewatering structures or devices and environmental erosion and sedimentation control devices outside of the Temporary Workspace as may be necessary to comply with applicable laws and regulations.

It is further agreed as follows:

1.      Grantor's granting of the Temporary Workspace to Grantee shall be on an exclusive basis during the full term of twenty-four (24) months from the start of Grantee's activities on the Property. Grantor shall grant no third party any right to use the Temporary Workspace prior to the expiration of Grantee's exclusive term to use the Temporary Workspace.

2.      Grantor and Grantee agree that the consideration for this Temporary Workspace includes payment for the value of the rights granted to Grantee by Grantor, and all damages of every kind and character including damages to fences, growing crops and timber, and the reestablishment of growing crops and timber. In the event the Property or any part of the Property is subject to an existing surface lease, any and all damages sustained by the existing surface tenant to crops, timber or other property belonging to the surface lease tenant as a result of the Grantee's use of this Temporary Workspace, shall, following payment from Grantee to Grantor hereunder, be promptly remitted to the surface tenant by Grantor.

3.      Grantee will restore, as nearly as practicable, to the same condition as existed prior to its activities the ground disturbed by the Grantee's use of the Temporary Workspace. Grantee shall have the right to install, maintain, and use gates in all fences which now cross or shall cross the Temporary Workspace or which provide access to Grantor's Property. Grantor shall allow Grantee to install its own lock if Grantee so chooses.

4.      There shall be no hunting, fishing, loitering, camping, or similar activities on the Temporary Workspace by Grantee, its officers, agents, employees, contractors, invitees, guests or representatives at any time.

5.     Grantee shall have the right to discharge water from excavations and other work areas on the Temporary Workspace onto the Property during Grantee's use of the Temporary Workspace. Water discharges will be performed in conformance with applicable governmental laws and regulations, and in a manner intended to minimize adverse impacts on the Property, and the crops and improvements on the Property. To the extent reasonably possible, without impacting the cost and timing of Grantee's work, Grantee shall coordinate with Grantor regarding locations of the discharge sites and locations of discharge filter devices.

6.     Grantee may elect to record this Agreement or a memorandum thereof. If Grantee does make this election, then Grantor will execute and return to Grantee any and all documents necessary to effectuate such recording. Upon sale of any portion of the Property affected by the Temporary Workspace, Grantor shall fully disclose to the buyer the existence of this Agreement.

7.     The rights, title and privileges herein granted may, in whole or in part, be sold, leased, and assigned, and shall be appurtenant to and run with the land and be binding upon and inure to the benefit of the Grantee and its successors, assigns, heirs and legal representatives.

8.     The undersigned warrant that they are the owner(s) of the Property herein described and have authority to execute this Agreement on behalf of the parties to this Agreement. This Agreement may be signed in counterparts and all such counterparts shall be deemed as originals and binding upon each party executing any counterpart and upon their respective heirs, representatives, successors and assigns.

9.     Grantor and Grantee agree that this Agreement is the product of their joint negotiation efforts and as such no provision in the Agreement shall be construed to the disadvantage of either Party.  This Agreement states the entire agreement between the parties regarding its subject matter, and no representations or statements, verbal or written, have been made that would modify, add to, or change the terms of this Agreement.

10.     The failure of Grantee to exercise or any delay of Grantee in exercising any rights herein conveyed in any single instance or from time to time shall not be considered or construed as a waiver of such right or rights and shall not bar Grantee from exercising such right or rights, or, if necessary, seeking an appropriate remedy in conjunction with the exercise or violation of such right or rights from time to time.

11.     Grantor understands and agrees that the person securing this grant on behalf of the Grantee is without authority from Grantee to make any agreement in respect of the subject matter hereof not herein expressed.

12.     Any and all written notices to which the parties shall be entitled hereunder or under any law, statute, rule, regulation, order, ordinance or policy of any governmental agency or entity having jurisdiction of the subject matter for which this Temporary Workspace is granted, shall be deemed delivered when the same has been placed in the U.S. Mail in a properly stamped envelope or other appropriate mail container, addressed to the addresses shown below, bearing the adequate

amount of postage to result in delivery of same to the address shown thereon, and sent by certified mail, return receipt requested, to the party to whom such notice is given. In the alternative, either party may give such notice by United Parcel Service (UPS), Federal Express or other similar national expedited mail service guaranteeing not later than two (2) day delivery of any such letter or notice to the addresses provided for herein.

   a.  Grantor and Grantee designate the following persons and addresses for all notices and information to be delivered hereunder:

   Grantor:     **City of Cambridge**
                250 Fresh Pond Parkway, Cambridge, MA 02138

   Grantee:     **Algonquin Gas Transmission, LLC**
                Attn: Right of Way Department
                915 North Eldridge Parkway, Suite 1100, Houston, Texas 77079

   b.  Such persons, addresses may be changed by the respective party by delivering written notice of such change to the other party.

(signatures on following page)

IN WITNESS WHEREOF, the GRANTOR herein has duly executed this Agreement as of the Effective Date.  If more than one grantor executes this Agreement, each grantor shall be deemed to have executed this Agreement as of the Effective Date.

GRANTOR:

**CITY OF CAMBRIDGE**

BY: _____
ITS: _____

## **EXHIBIT A**

Temporary Workspace Drawing and Grantor's Property Legal Description
(to be attached)

`





# APPRAISAL REPORT

CITY OF CAMBRIDGE PARCEL
NORTH SIDE OF ROUTE 2 (CAMBRIDGE TURNPIKE),
APPROXIMATELY 0.2 MILES EAST OF BEDFORD ROAD
LINCOLN, MASSACHUSETTS  01773
CBRE FILE NO. CB24US015751-1

CLIENT: ALGONQUIN GAS TRANSMISSION, LLC

CBRE

VALUATION & ADVISORY SERVICES



33 Arch Street, 28ᵗʰ Floor
Boston, MA 02110
www.cbre.com

April 15, 2024

Nancy Kist
Algonquin Gas Transmission, LLC
890 Winter Street, Suite 320
Waltham, MA 02451

RE:     Appraisal of: City of Cambridge Parcel
        Temporary Workspace Easement Area
        North side of Route 2 (Cambridge Turnpike), approximately 0.2 miles east of Bedford
Road
        Lincoln, Middlesex, Massachusetts
        CBRE, Inc. File No. CB24US015751-1

Dear Ms. Kist:

In accordance with your request, CBRE has performed a valuation as of March 7, 2024, of certain real property exhibited to us, that is owned by the city of Cambridge, MA. The larger parcel of the subject comprises tax parcels 127-15, 128-1, 128-2, located along the northern side of Route 2 in Lincoln, Massachusetts. There are a number of existing easements on the land, and the subject of this report is the larger parcel for consideration of compensation against a proposed Temporary Workspace Easement (TWS). The easement is for the maintenance and repair of an existing Tennessee Gas Pipeline Company Easement (Map 127, Lot 16) transmission Line and associated improvements in the permanent easement areas. The proposed TWS has a reported area of 0.247 acres or 10,765 SF. The term or duration of the temporary easement was reported at two years.

The purpose of this appraisal is to assist the client in making internal decisions as they relate to our opinion of the market value of the fee simple estate in the real property as well as an estimate of compensation for the temporary easement area.

This valuation summary represents an Appraisal Report as set forth under Standards Rule 2-2(a) of USPAP. The content of this report is based on the specific needs of the client. Our opinions are intended to assist Algonquin Gas Transmission, LLC with license negotiation efforts related to the proposed TWS project. Algonquin Gas Transmission, LLC is our client of record, and the intended users of this report. CBRE has no duty to any other party regarding the analysis or conclusions herein. No third party shall have the right of reliance on this report, and neither receipt nor possession of this report by any third party shall create any express or implied third-party beneficiary rights. The conclusions herein are subject to the Assumptions and Limiting Conditions.

The larger parcel of the subject property comprises 154.80 acres of R1 and R2 Residential zoned lands currently comprising both raw woodlands and wetlands. The entirety of the acreage in the larger parcel is subject to Conservation Easement and has been classed as such primarily to protect the quality and integrity of the waterways and runoff that service a number of water sources and habitats that the City of Cambridge and others wish to preserve. Please reference the Addenda for more information about the subject property, the existing conservation easement, and the proposed TWS Survey and Site Plan in greater detail.

Based on the information and analysis summarized in this report, it is our opinion that, as of March 7, 2024, the total allocated Fee Simple value assigned to the proposed TWS area for a period of 24 months is reasonably represented in the amount of $500, shown as follows below.

| COMPENSATION SUMMARY | |
|---|---|
| **Appraisal Premise** | **Market Value** |
| Estimated Land Value Proposed TWS Area | $2,470 |
| **Total Estimated Just Compensation** | **$500** |
| Compiled by CBRE | |

The report, in its entirety, including all assumptions and limiting conditions, is an integral part of, and inseparable from, this letter. The following appraisal sets forth the most pertinent data gathered, the techniques employed, and the reasoning leading to the opinion of value. The analyses, opinions and conclusions were developed based on, and this report has been prepared in conformance with, the guidelines and recommendations set forth in the Uniform Standards of Professional Appraisal Practice (USPAP), and the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

The intended use and user of our report are specifically identified in our report as agreed upon in my contract for services and/or reliance language retained in the appraiser's workfile. As a condition to being granted the status of an intended user, any intended user who has not entered into a written agreement with CBRE in connection with its use of our report agrees to be bound by the terms and conditions of the agreement between CBRE and the client who ordered the report.

No other use or user of the report is permitted by any other party for any other purpose. Dissemination of this report by any party to any non-intended users does not extend reliance to any such party, and CBRE will not be responsible for any unauthorized use of or reliance upon the report, its conclusions or contents (or any portion thereof).

It has been a pleasure to assist you in this assignment. If you have any questions concerning the analysis, or if CBRE can be of further service, please contact us.



Respectfully submitted,

CBRE - VALUATION & ADVISORY SERVICES

Garrett W. Gerstung, MAI, AI-GRS
First Vice President
MA Cert. Gen. Appraiser Lic. #1000231
Phone:    617-957-2747
Email:    Garrett.Gerstung@cbre.com

CBRE

# Table of Contents

Table of Contents ......................................................................................................... 4

Certification ................................................................................................................. 5

Subject Larger Parcel .................................................................................................. 6

Executive Summary ..................................................................................................... 7

Extraordinary Assumptions & Hypothetical Conditions ........................................... 8

Introduction ................................................................................................................. 9

Neighborhood Analysis ............................................................................................. 13

Site Analysis .............................................................................................................. 16

Highest and Best Use ................................................................................................ 19

Appraisal Methodology ............................................................................................. 20

Valuation Before Imposition of License Agreement ................................................ 21

Valuation of Temporary Workspace Easement ........................................................ 26

Conclusion ................................................................................................................. 27

Assumptions and Limiting Conditions ..................................................................... 28

ADDENDA

A    Land Sale Summaries

B    Survey and Temporary Area Measurement

C    Conservation Easement

D    Subject Photos

E    Qualifications



# Certification

I certify to the best of our knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial and unbiased professional analyses, opinions, and conclusions.

3. I have no present or prospective interest in or bias with respect to the property that is the subject of this report and have no personal interest in or bias with respect to the parties involved with this assignment.

4. My engagement in this assignment was not contingent upon developing or reporting predetermined results.

5. My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

6. My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice and the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

7. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

8. As of the date of this report, Garrett W. Gerstung, MAI, AI-GRS has completed the Education Requirements for Members of the Appraisal Institute.

9. A personal inspection of the subject property was made on March 7, 2024.

10. No one provided real property appraisal assistance to the persons signing this report.

11. Valuation & Advisory Services operates as an independent economic entity within CBRE, Inc. Although employees of other CBRE, Inc. divisions may be contacted as a part of our routine market research investigations, absolute client confidentiality and privacy were maintained at all times with regard to this assignment without conflict of interest.

12. I have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding agreement to perform this assignment.

Garrett W. Gerstung, MAI, AI-GRS
State of Massachusetts
Certified General Real Estate Appraiser
License No. 1000231



## Subject Larger Parcel



CBRE

# Executive Summary

### EXECUTIVE SUMMARY

| | |
|---|---|
| **Property Name** | City of Cambridge Parcel |
| **Location** | North side of Route 2 (Cambridge Turnpike), approximately 0.2 miles east of Bedford Road, Lincoln, Middlesex County, Massachusetts  01773 |
| **Property Owner Name** | City of Cambridge, MA |
| **Highest and Best Use** | |
| As If Vacant | Recreational and Conservation |
| **Property Rights Appraised** | Fee Simple Estate, Temporary Easement Rights |
| **Date of Inspection** | March 7, 2024 |
| **Date of Value** | March 7, 2024 |
| **Estimated Exposure Time** | 9 - 12 Months |
| **Estimated Marketing Time** | 9 - 12 Months |
| **Land Area - Whole Property** | 154.800 Acres |
| **Easement/Licensed Area** | |
| Temporary Construction Easement | 0.247 AC |

| **VALUATION** | *(Rounded)* | *Per Acre* |
|---|---|---|
| Land Value - Larger Parcel @ 155 Acres in size | $1,548,000 | $10,000 |

### COMPENSATION SUMMARY

| Appraisal Premise | Market Value |
|---|---|
| Estimated Land Value Proposed TWS Area | $2,470 |
| **Total Estimated Just Compensation** | **$500** |
| Compiled by CBRE | |



# Extraordinary Assumptions & Hypothetical Conditions

An extraordinary assumption is defined as "an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions." [1]

- A soils analysis for the site has not been provided for the preparation of this appraisal.  In the absence of a soils report, it is a specific assumption that the site has adequate soils to support the highest and best use.

- For the purposes of this appraisal, we have made the extraordinary assumption that the Project will not impact existing mineral rights and/or interests, if any, that may exist within the subject property.

- For purposes of this appraisal, we have made the extraordinary assumption that the proposed temporary construction easement will not impact any other existing easement or license holders. If this is later found to be false, we reserve the right to update our appraisal accordingly.

The use of these assumptions may affect the assignment results.

A hypothetical condition is defined as "a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results but is used for the purposes of analysis." [2]

No hypothetical conditions have been included.

---

[1] The Appraisal Foundation, *USPAP, 2020-2021*

[2] The Appraisal Foundation, *USPAP, 2020-2021*



# Introduction

### IDENTIFICATION OF SUBJECT

The subject property larger parcel totals just over 155 acres of R1 and R2 lands under a conservation easement that restricts development and use beyond minor exceptions. The lands are raw and wooded other than easement improvements. The subject is located along the north side of Route 2 in Lincoln, Massachusetts.

### OWNERSHIP AND PROPERTY HISTORY

According to USPAP Standards Rule 1-5(b), an appraiser must consider and analyze any sales of the appraised real property that have occurred within the prior three years. Title to the property is currently vested in the city of Cambridge. Ownership of the subject property has not transferred within the prior three years. Further, to the best of our knowledge, the property is not under contract or listed for sale at this time.

### INTENDED USE OF REPORT

The intended use is to aid the client, Algonquin Gas Transmission, LLC, in making internal decisions as they relate to the determination of annual market rent for the proposed Temporary Workspace Easement.

### INTENDED USER OF REPORT

The intended users are parties within Algonquin Gas Transmission, LLC.

> Intended Users - the intended user is the person (or entity) who the appraiser intends will use the results of the appraisal.  The client may provide the appraiser with information about other potential users of the appraisal, but the appraiser ultimately determines who the appropriate users are given the appraisal problem to be solved. Identifying the intended users is necessary so that the appraiser can report the opinions and conclusions developed in the appraisal in a manner that is clear and understandable to the intended users.  Parties who receive or might receive a copy of the appraisal are not necessarily intended users.  The appraiser's responsibility is to the intended users identified in the report, not to all readers of the appraisal report. [3]

Reliance on any reports produced by CBRE under the Contract for Services is extended solely to parties and entities expressly acknowledged in a signed writing by CBRE as Intended Users of the respective report, provided that any conditions to such acknowledgement required by CBRE or hereunder has been satisfies. Parties or entities other than the Intended Users who obtain a copy of the report or any portion thereof (including Client if it is not named as an Intended User), whether as a result of its direct dissemination or by any other means, may not rely upon any opinions or conclusions contained in the report or such portions thereof, and CBRE will not be responsible for any unpermitted use of the reports, its conclusions or contents or have any liability in connection therewith.

---

[3] Appraisal Institute, *The Appraisal of Real Estate*, 14th ed. (Chicago: Appraisal Institute, 2013), 50.



## PURPOSE OF THE APPRAISAL

The purpose of this appraisal is to express our opinion of the market value of the fee simple estate in the real property in order to provide an estimate of compensation or market rent for the proposed temporary construction easement.

## COMPETENCY STATEMENT

Based on licensure, previous experience, training and education, the appraisers are competent to appraise the subject property.  The appraisers have prepared this appraisal report competently.

## DEFINITION OF VALUE

- *Market rent* is defined as "the most probable rent that a property should bring in a competitive and open market reflecting the conditions and restrictions of a specified lease agreement, including rental adjustment and revaluation, permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options, and tenant improvements (TIs)." (*The Dictionary of Real Estate Appraisal*, seventh edition, 2022)

## INTEREST APPRAISED

The values estimated represent Fee Simple Estate in the Larger Parcel allocated to the Easement area. Fee Simple Estate is defined as follows:

- *Fee Simple Estate* - Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power and escheat. (The Dictionary of Real Estate Appraisal, seventh edition, 2022)



## SCOPE OF WORK

This Appraisal Report is intended to comply with the reporting requirements set forth under Standards Rule 2 of USPAP.  The scope of the assignment relates to the extent and manner in which research is conducted, data is gathered, and analysis is applied.  CBRE, Inc. completed the following steps for this assignment:

### Extent to Which the Property is Identified

To estimate a value for the identified property in its entirety and compensation for imposition of a temporary workspace easement, we considered the following:

- Documents from Algonquin Gas Transmission, LLC which include, but are not limited to, surveys, legal descriptions, easement legal descriptions, and easement documents.
- Documents uncovered during our investigation which include, but are not limited to, GIS maps, zoning maps, zoning ordinances, tax and assessment information, floodplain maps, topography maps, soil maps, regional demographic data, and county comprehensive plans.
- Market data collected from sources deemed reliable including county records, other real estate professionals such as brokers, information within our database, and other published sales data sources.
- Comparable sales, of which, no inspections were made.
- As applicable, the location, size, frontage, access, topography, shape, existing easements, zoning, use, available utilities, and other physical attributes of the subject property compared to properties within the marketplace.
- The highest and best use of the subject property as if vacant.
- All three approaches to value. Our conclusions rely on the approach or approaches judged to be most appropriate for the purpose and scope of our analysis, as well as the nature and reliability of the data available to us. The valuation methodology employed is described in a subsequent section of the report.
- The estimated physical effects on the subject property in the after condition were based on the scope and character of the proposed temporary workspace easement as shown in the exhibit. The valuation methodology employed is described in a subsequent section of the report.
- The location of the proposed temporary workspace easement area on the subject property.
- The impact the workspace easement may have on the surface, subsurface, and air rights of the underlying-property owner.

### Extent to Which the Property is Inspected

The subject property was inspected by Garrett W. Gerstung, MAI, AI-GRS with a representative of Algonquin Gas Transmission, LLC on March 7, 2024. This included views from public rights of way as well as interior inspection of the proposed Temporary Construction Easement area.



## DEFINITIONS

Definitions applicable to this analysis are presented as follows:

- *Just compensation* is defined as "the amount of money which will put the person whose property has been taken in as good a position as the person would have been in had the taking not occurred. The owner must not be forced to sacrifice or suffer by receiving less than full and fair value for the property. Just compensation should enrich neither the individual at the expense of the public nor the public at the expense of the individual" (M Civ JI 90.095 Just Compensation - Definition).

- *Highest and best use* is defined as "the reasonably probable use of property that results in the highest value." (The Dictionary of Real Estate Appraisal, seventh edition, 2022)

- *Damages* are defined as "the loss in value to the remainder in a partial taking of property. Generally, the difference between the value of the whole property before the taking and the value of the remainder after the taking is the measure of the value of the part taken and the damages to the remainder." (The Dictionary of Real Estate Appraisal, seventh edition, 2022)

- *Larger parcel* is defined as "in governmental land acquisitions and in valuation of charitable donations of partial interests in property such as easements, the tract or tracts of land that are under the beneficial control of a single individual or entity and have the same, or an integrated, highest and best use. Elements for consideration by the appraiser in making a determination in this regard are contiguity, or proximity, as it bears on the highest and best use of the property, unity of ownership, and unity of highest and best use. In most states, unity of ownership, contiguity, and unity of use are the three conditions that establish the larger parcel for the consideration of severance damages. In federal and some state cases, however, contiguity is sometimes subordinated to unitary use." (The Dictionary of Real Estate Appraisal, seventh edition, 2022)

- *Exposure time* is defined as the "estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal." (USPAP, 2024 edition)



# Neighborhood Analysis



## Location

The subject is located along the north side of Route 2 in Lincoln, Massachusetts, less than two miles west of I-95 in the western portion of the Greater Boston suburbs.

| NEIGHBORHOOD CHARACTERISTICS | |
|---|---|
| **Location** | Suburban |
| **Land Use Trend Toward** | Rural Residential |
| **Property Values** | Stable |
| **Nearest Major City** | Boston, MA |
| **Historical Uses** | Rural Residential |
| **Surrounding Land Uses** | Land uses within the general neighborhood are primarily residential with a mixture of industrial and commercial sporadically located. Conservation and Residential uses dominate the immediate area surrounding the subject. Commercial and retail uses are generally located along main roadways to the south and east. |

CBRE

Property Appraised

## TAX MAP



The subject TWS is proposed to be located wholly on Parcel 127-15 totaling 53.6 acres in size. The larger parcel includes the tax parcels 127-15, 128-1, 128-2 and totals roughly 155 acres in size. All parcels are zoned either R1 or R2 and would allow for residential development if not subject to a previously existing conservation easement.

CBRE

**PROPOSED TEMPORARY WORKSPACE EASEMENT AREA**



The subject TWS area is shown in the blue highlighted boundary above, reported to total 0.247 acres in size. Again, this is to be wholly located on Parcel 127.15.  The larger parcel includes the adjacent parcels to the north and east of this primary parcel.

CBRE

# Site Analysis

The following chart summarizes the salient characteristics of the subject site.

| SITE SUMMARY | |
|---|---|
| Affected Tax IDs | 127-15, 128-1, 128-2 |
| Zoning | R1, R2 |
| Legally Conforming | Yes |
| Flood Zone | Yes |
| Flood Map Panel No. | 25017C0383F |
| Flood map Date | 7/7/2014 |
| Utilities | The subject has access to:<br>- public water service and private septic system<br>- electricity |
| Access/Frontage | Adequate but minimal along Route 2/Cambridge Turnpike |
| Shape | Irregular |
| Topography | Hilly |
| Drainage | Appears adequate |
| Existing Encumbrances | |
| | Petroluem or Natural Gas Pipelines & Electrical Transmission Lines with access roads. Conservation Easement in place restricts development and allows for non-commercial passive outdoor recreation, education, or research, as well as incidental excavation and removal of soils for watershed management, and acts consistent with the pre-existing easement of Algonquin Gas Transmission Company. |
| Environmental Issues | None known. See extraordinary assumptions. |
| Improvements | Easement-based pump station and supportive structures |

## ENVIRONMENTAL ISSUES

The appraiser is not qualified to detect the existence of potentially hazardous material or underground storage tanks which may be present on or near the site. The existence of hazardous materials or underground storage tanks may affect the value of the property. For this appraisal, CBRE, Inc. has specifically assumed that the property is not affected by any hazardous materials that may be present on or near the property.

## EXISTING ENCUMBRANCES

The subject lands are encumbered by not only the previously mentioned Algonquin Gas Transmission Company easement but also a MassDOT Drain Easement and a Tennessee Gas Pipeline Company Easement (Map 127, Lot 16). These easements are located along the southern and western boundaries of the subject.



## FLOOD MAP



The larger parcel of the subject property spans multiple flood panels, with the primary parcel housing the proposed easements located in Flood Map 25017C0383F, dated July 7, 2014. A larger portion of the subject is identified to be within areas of 0.2% annual flood chance and 1% annual chance flooding with average depths of less than one foot or with drainage areas less than one square mile.

The tax card for the primary parcel of the subject where easements exist and are proposed, 127-15, is indicated to have 23.03 acres of wetlands by the town of Lincoln.

CBRE

## ZONING

The subject property is zoned R1 and R2 by the town of Lincoln, Massachusetts. A summary of the applicable zoning regulations are presented below. It is important to note that the subject lands are owned by the city of Cambridge and are utilized by the Algonquin gas pipeline via easement for operations.

| ZONING SUMMARY | |
| --- | --- |
| Current Zoning | R1, R2 |
| Legally Conforming | Yes |
| Uses Permitted | A variety of agricultural, residential and public servic uses that serve the community's needs. |
| Zoning Change | Not in the immediate future |
| Comments | The larger parcel spans three tax parcels that are all under R1 or R2 zoning and are owned by the city of Cambridge Massachusetts. |
| Source: City of Cambridge Zoning Ordinance | |

### Zoning Conclusion

The subject easement is a legal and conforming use based on a review of the applicable zoning ordinances and the conservation easement included within the addenda herein.



# Highest and Best Use

In appraisal practice, the concept of highest and best use represents the premise upon which value is based.  The four criteria the highest and best use must meet are:

- **Physically Possible Use**
  Determine which uses are physically possible for the subject

- **Legally Permissible Use**
  Determine which uses are legally permitted for the subject

- **Financially Feasible Use**
  Determine which physically possible and legally permissible uses will produce a net return to the subject

- **Most Profitable Use**
  Determine which use, among the feasible uses, is the most profitable use of the subject

## LAND AS IF VACANT

The highest and best use of land as if vacant is the use among all reasonable, alternative uses that yields the highest present land value, after payments are made for labor, capital, and coordination. The use of a property is based on the assumption that the land is vacant or can be made vacant by demolishing any improvements.

In determining the physically possible and legally permissible highest and best uses of the subject property, we considered the subject's zoning, existing easements and encumbrances, shape and topography suitability, soil, and drainage adequacy.

Therefore, based on an analysis of the above criteria, the highest and best use of the subject land as if vacant is for residential development.



# Appraisal Methodology

In appraisal practice, an approach to value is included or omitted based on its applicability to the property type being valued and the quality and quantity of information available.

## Cost Approach

The Cost Approach is based on the proposition that the informed purchaser would pay no more for the subject than the cost to produce a substitute property with equivalent utility. This approach is particularly applicable when the property being appraised involves relatively new improvements that represent the highest and best use of the land, or when it is improved with relatively unique or specialized improvements for which there few sales or leases of comparable properties that exist.

## Sales Comparison Approach

The Sales Comparison Approach utilizes sales of comparable properties, adjusted for differences, to indicate a value for the subject. Valuation is typically accomplished using physical units of comparison such as price per square foot, price per unit, price per floor, etc., or economic units of comparison such as gross rent multiplier. Adjustments are applied to the physical units of comparison derived from the comparable sale. The unit of comparison chosen for the subject is then used to yield a total value.

## Income Capitalization Approach

The Income Capitalization Approach reflects the subject's income-producing capabilities. This approach is based on the assumption that value is created by the expectation of benefits to be derived in the future. Specifically estimated is the amount an investor would be willing to pay to receive an income stream plus reversion value from a property over a period of time. The two common valuation techniques associated with the income capitalization approach are direct capitalization and the discounted cash flow (DCF) analysis.

## METHODOLOGY APPLICABLE TO THE SUBJECT

We applied the sales comparison approach to value the land as it was considered to be the most pertinent and appropriate in the valuation of the appraised property. Valuation by the sales comparison approach involved a comparison of sales of properties that exhibited characteristics similar to the subject. We have excluded the cost approach and income capitalization approach as this approach is not generally applicable for vacant land; moreover, market participants do not generally rely on these approaches.

The valuation of the subject property is outlined in the subsequent report sections.



Before Value

# Valuation Before Imposition of License Agreement

## LAND VALUE

Land is valued as if vacant and available for development to its highest and best use. Similar land that has recently sold is investigated, and a comparative analysis is made of factors influencing value. The market value of the appraised land is determined by direct analysis of sales of similar types of vacant land in the local market. A comparative analysis was then made of factors influencing value. Since a sale seldom possesses all of the various characteristics of an appraised property, some judgment must be made in arriving at a final estimate.

<u>Selection of Comparable Land Sales</u>

Under the sales comparison approach, the estimated market value of the larger parcel appraised 154.80 acres of land was determined by direct analysis of sales of similar types of vacant land in the local market. Our market investigation revealed various land comparables that exhibit the general range of unit prices within which the local market is operating. The most pertinent land comparables found as a result of our field investigation are summarized as follows:

| | SUMMARY OF COMPARABLE LAND SALES | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| No. | Address Municipality/State | Transaction Type | Date | Actual Sale Price | Size (Acres) | Size (SF) | Price Per AC | Zoning |
| 1 | 19 Lyman Road Town of Berlin, MA | Fee Simple | 11/8/2022 | $1,150,000 | 59.54 | 2,593,562 | $19,315 | RA, Residential Agriculture |
| 2 | 66 Hardy Road Town of Ashburnham, MA | Fee Simple | 6/15/2022 | $995,000 | 134.30 | 5,850,108 | $7,409 | GB, RR |
| 3 | 27 Worcester Road (rear) Town of Princeton, MA | Fee Simple | 4/9/2019 | $99,000 | 16.40 | 714,384 | $6,037 | Residential |
| 4 | Calamint Hill Road Town of Princeton, MA | Fee Simple | 3/23/2018 | $285,000 | 99.79 | 4,346,940 | $2,856 | Residential |
| Subject | North side of Route 2 Lincoln, Massachusetts | Fee Simple | --- | --- | 154.80 | 5,739,901 | --- | R1, R2 |
| Compiled by CBRE | | | | | | | | |

A map showing the locations of the land comparables follows:



Before Value



## DISCUSSION OF ADJUSTMENTS

As shown in the following sales comparison grid, percentage adjustments were made to each comparable where applicable based upon a comparative analysis of factors influencing value. For certain adjustment factors where possible given availability of market data, our percentage adjustments were market extracted or based upon direct supporting quantitative data. For the remaining adjustment factors, sufficient market data was not present or available to extract adjustments through paired sales or statistical analyses. When such data is not present, market participants can often identify superior or inferior characteristics when comparing properties. Without paired sales or statistical information, applying quantitative adjustments to reflect the differences is often problematic or subjective. Therefore, we prefer to rely on a blended approach that allows us to be transparent in expressing the degree to which we believe a comparable differs from the subject by making a quantitative adjustment on a qualitative basis. This process mirrors the judgements made by market participants such as real estate brokers during price discovery and is supported by our professional experience. When possible, we support adjustments with numerical market data but in the absence of such data, we support numerical adjustments with anecdotal data and judgement.

As such, based upon a qualitative approach and analyses for certain factors, we assigned the following percentage adjustments based on qualitative comparisons with the subject property:



| CONVERSION OF QUALITATIVE DIFFERENCES INTO PERCENTAGE ADJUSTMENTS | |
| --- | --- |
| Qualitative Difference | Typical Adjustment |
| Slight Difference | 0-10% |
| Moderate Difference | 10%-20% |
| Fair Difference | 20%-30% |
| Significant Difference | 30%+ |

## LAND ADJUSTMENT GRID

Based on our comparative analysis, the following chart summarizes the adjustments warranted to each comparable.



| | Subject | Comp No. 1 | Comp No. 2 | Comp No. 3 | Comp No. 4 |
|---|---|---|---|---|---|
| **LAND SALES ADJUSTMENT GRID** | | | | | |
| Date of Sale | | 11/8/2022 | 6/15/2022 | 4/9/2019 | 3/23/2018 |
| Address | North side of Route 2 (Cambridge Turnpike), approximately 0.2 miles east of Bedford Road | 19 Lyman Road | 66 Hardy Road | 27 Worcester Road (rear) | Calamint Hill Road |
| Municipality | Lincoln | Town of Berlin | Town of Ashburnham | Town of Princeton | Town of Princeton |
| State | Massachusetts | MA | MA | MA | MA |
| Gross Acres | 154.800 Acres | 59.54 | 134.30 | 16.40 | 99.79 |
| Actual Sale Price | | $1,150,000 | $995,000 | $99,000 | $285,000 |
| Adjusted Sale Price [1] | | $1,150,000 | $995,000 | $99,000 | $285,000 |
| Unit Price | $ Per AC | $19,315 | $7,409 | $6,037 | $2,856 |
| Property Rights Conveyed | | 0% | 0% | 0% | 0% |
| Financing | | 0% | 0% | 0% | 0% |
| Conditions of Sale | | 0% | 0% | 0% | 0% |
| Market Conditions (Time) | | 1% | 2% | 5% | 7% |
| Adjusted $/SF | | $19,508 | $7,557 | $6,338 | $3,056 |
| **Relative Location** | Lincoln | Town of Berlin | Town of Ashburnham | Town of Princeton | Town of Princeton |
| % Adjustment | | 5% | 20% | 20% | 20% |
| Size | 154.80 | 59.540 | 134.300 | 16.400 | 99.792 |
| % Adjustment | | -10% | 0% | -10% | -5% |
| Topography & Flood Zone | Rolling with Wetlands | Gently Rolling/Zone X & AE | Rolling/Zone X | Gently Rolling/Zone X & AE | Rolling/Zone X & AE |
| % Adjustment | | -10% | -10% | 0% | -10% |
| Shape/Utility | Irregular | Irregular | Irregular | Irregular | Irregular |
| % Adjustment | | 0% | 0% | 0% | 0% |
| Utilities | Available along frontage | Electric along frontage | Electric along frontage | Available public utilities | Available public utilities |
| % Adjustment | | 0% | 0% | 0% | 0% |
| Zoning/Use | R1 & R2 | RA, Residential Agriculture | GB, RR | Residential | Residential |
| % Adjustment | | 0% | -5% | 0% | 0% |
| Frontage/Access | Adequate but difficult given traffic speed and frontage location | Adequate | Adequate | Adequate | Adequate |
| % Adjustment | | 0% | 15% | 15% | 10% |
| Existing Easements | Drainage and Gas Pipelines, Conservation Easement | Typical along frontage | Conservation | ROW access via other tax parcel | Conservation |
| % Adjustment | | -20% | 0% | 25% | 0% |
| Net Adjustment | | -35% | 20% | 50% | 5% |
| **Indicated Unit Value** | | $12,680 | $9,068 | $9,507 | $3,209 |
| Compiled by CBRE | | | | | |
| **Estimated Unit Value** | | | | $10,000 | |

In estimating the market value for the subject property in its entirety before imposition of the easement, we considered the following:

- The size, shape, available utilities, and other physical attributes of the subject property compared to properties within the marketplace
- Recent land development trends within the local neighborhood and surrounding area
- The fact that the subject property is situated outside the floodplain
- The subject property's frontage along West Street via the larger parcel, and the existing access to the subject.
- The existing easements on the property, most notably, the existing conservation easement
- Recent trends in residential land values

### RECONCILIATION OF LAND VALUE

Based on our analyses, it is our opinion that, as of March 7, 2024, the estimated market value of the subject property is reasonably represented in the amount of $10,000 per acre, or $1,548,000 for the larger parcel. Allocated to the license area, this equates to $2,470 in fee simple value. The following table presents the valuation conclusion:

| CONCLUDED LAND VALUE | | | | | | |
|---|---|---|---|---|---|---|
| | $ Per AC | | AC | | Total | |
| Whole Property | $10,000 | x | 154.800 Acres | = | $1,548,000 | |
| Easement Area | $10,000 | x | 0.247 | = | $2,470 | |
| Compiled by CBRE | | | | | | |



# Valuation of Temporary Workspace Easement

The subject property will be encumbered by a temporary workspace easement encompassing a total of 0.247 acres or 10,765 SF. Access to the easement is considered to be provided by the existing permanent easement for service and repair. The site has a wooded and rolling topography with the trees to be removed in the temporary easement area not considered to contribute additional value. All of the area within the temporary easement area currently comprises vacant land zoned for residential purposes, but subject to a conservation easement.

In determining the market rent of the proposed temporary easement areas, I first established the market value of the fee simple estate in the land encumbered by the easement. Given the previous value conclusions, a unit value of $10,000 per acre is believed reasonable for the 0.247 total acres of subject land encumbered within the proposed temporary easement areas. Accordingly, a value of $2,470 is calculated for the land encumbered by the temporary easement area.

At the request of the client, and for the purposes of this assignment, I have utilized a 24-month lease term.

To estimate market rent for the proposed Temporary Workspace Easement, I applied an appropriate annual rate of return to the market value of the fee simple estate in the land for the specified term of the easement in order to determine the total annual market rent. The annual rate of return is based on an analysis of rental rates, market surveys, and peer-published studies including "Appraising Pipeline Easements – A Practical Approach" by Gary Valentine, MAI, ASA, SR/WA, as published in the March/April 2008 issue of *Right of Way Magazine* and "Valuing a Gas Pipeline Easement – A History and Synthesis of Methodology" by William R. Lang, MAI, and Brett A. Smith as published in the September/October 1998 issue of *Right of Way Magazine*. The finding from these studies regarding the annual percentage rates of return are summarized as follows:

- "Appraising Pipeline Easements – A Practical Approach"

  Land Rates Survey Pipeline Company 10% to 12%

- "Valuing a Gas Pipeline Easement – A History and Synthesis of Methodology"

  Apply a 10% Fee Value land rent over the construction period

Given the above-cited analyses, an annual percentage rate of return of 10% (0.83% monthly) was concluded as reasonable for the temporary easements.

The total rounded compensation is calculated for the land encumbered by the temporary easement as follows:

| TEMPORARY RIGHT-OF-WAY | | | | | | |
|---|---|---|---|---|---|---|
| Area | Size | $ Per AC | Annual Rental Rate | | Term | Temp Esmt Value |
| Proposed TWS | 0.247 AC | $10,000 x x | 10% | @ | 2  Yr | $494 |
| **Total** | | | | | | **$500** |
| Compiled by CBRE | | | | | | |



## Conclusion

Therefore, based on the information and analysis summarized in this report, it is our opinion that, as of March 7, 2024, total compensation due to imposition of the proposed temporary workspace easement on the real property is reasonably represented in the amount of $500.

CBRE

# Assumptions and Limiting Conditions

1. CBRE, Inc. through its appraiser (collectively, "CBRE") has inspected through reasonable observation the subject property. However, it is not possible or reasonably practicable to personally inspect conditions beneath the soil and the entire interior and exterior of the improvements on the subject property. Therefore, no representation is made as to such matters.

2. The report, including its conclusions and any portion of such report (the "Report"), is as of the date set forth in the letter of transmittal and based upon the information, market, economic, and property conditions and projected levels of operation existing as of such date. The dollar amount of any conclusion as to value in the Report is based upon the purchasing power of the U.S. Dollar on such date. The Report is subject to change as a result of fluctuations in any of the foregoing. CBRE has no obligation to revise the Report to reflect any such fluctuations or other events or conditions which occur subsequent to such date.

3. Unless otherwise expressly noted in the Report, CBRE has assumed that:

   (i) Title to the subject property is clear and marketable and that there are no recorded or unrecorded matters or exceptions to title that would adversely affect marketability or value. CBRE has not examined title records (including without limitation liens, encumbrances, easements, deed restrictions, and other conditions that may affect the title or use of the subject property) and makes no representations regarding title or its limitations on the use of the subject property. Insurance against financial loss that may arise out of defects in title should be sought from a qualified title insurance company.

   (ii) Existing improvements on the subject property conform to applicable local, state, and federal building codes and ordinances, are structurally sound and seismically safe, and have been built and repaired in a workmanlike manner according to standard practices; all building systems (mechanical/electrical, HVAC, elevator, plumbing, etc.) are in good working order with no major deferred maintenance or repair required; and the roof and exterior are in good condition and free from intrusion by the elements. CBRE has not retained independent structural, mechanical, electrical, or civil engineers in connection with this appraisal and, therefore, makes no representations relative to the condition of improvements. CBRE appraisers are not engineers and are not qualified to judge matters of an engineering nature, and furthermore structural problems or building system problems may not be visible. It is expressly assumed that any purchaser would, as a precondition to closing a sale, obtain a satisfactory engineering report relative to the structural integrity of the property and the integrity of building systems.

   (iii) Any proposed improvements, on or off-site, as well as any alterations or repairs considered will be completed in a workmanlike manner according to standard practices.

   (iv) Hazardous materials are not present on the subject property. CBRE is not qualified to detect such substances. The presence of substances such as asbestos, urea formaldehyde foam insulation, contaminated groundwater, mold, or other potentially hazardous materials may affect the value of the property.

   (v) No mineral deposit or subsurface rights of value exist with respect to the subject property, whether gas, liquid, or solid, and no air or development rights of value may be transferred. CBRE has not considered any rights associated with extraction or exploration of any resources, unless otherwise expressly noted in the Report.

   (vi) There are no contemplated public initiatives, governmental development controls, rent controls, or changes in the present zoning ordinances or regulations governing use, density, or shape that would significantly affect the value of the subject property.

   (vii) All required licenses, certificates of occupancy, consents, or other legislative or administrative authority from any local, state, nor national government or private entity or organization have been or can be readily obtained or renewed for any use on which the Report is based.

   (viii) The subject property is managed and operated in a prudent and competent manner, neither inefficiently or super-efficiently.

   (ix) The subject property and its use, management, and operation are in full compliance with all applicable federal, state, and local regulations, laws, and restrictions, including without limitation environmental laws, seismic hazards, flight patterns, decibel levels/noise envelopes, fire hazards, hillside ordinances, density, allowable uses, building codes, permits, and licenses.

   (x) The subject property is in full compliance with the Americans with Disabilities Act (ADA). CBRE is not qualified to assess the subject property's compliance with the ADA, notwithstanding any discussion of possible readily achievable barrier removal construction items in the Report.



(xi) All information regarding the areas and dimensions of the subject property furnished to CBRE are correct, and no encroachments exist. CBRE has neither undertaken any survey of the boundaries of the subject property nor reviewed or confirmed the accuracy of any legal description of the subject property.

Unless otherwise expressly noted in the Report, no issues regarding the foregoing were brought to CBRE's attention, and CBRE has no knowledge of any such facts affecting the subject property. If any information inconsistent with any of the foregoing assumptions is discovered, such information could have a substantial negative impact on the Report. Accordingly, if any such information is subsequently made known to CBRE, CBRE reserves the right to amend the Report, which may include the conclusions of the Report. CBRE assumes no responsibility for any conditions regarding the foregoing, or for any expertise or knowledge required to discover them. Any user of the Report is urged to retain an expert in the applicable field(s) for information regarding such conditions.

4. CBRE has assumed that all documents, data and information furnished by or behalf of the client, property owner, or owner's representative are accurate and correct, unless otherwise expressly noted in the Report. Such data and information include, without limitation, numerical street addresses, lot and block numbers, Assessor's Parcel Numbers, land dimensions, square footage area of the land, dimensions of the improvements, gross building areas, net rentable areas, usable areas, unit count, room count, rent schedules, income data, historical operating expenses, budgets, and related data. Any error in any of the above could have a substantial impact on the Report. Accordingly, if any such errors are subsequently made known to CBRE, CBRE reserves the right to amend the Report, which may include the conclusions of the Report. The client and intended user should carefully review all assumptions, data, relevant calculations, and conclusions of the Report and should immediately notify CBRE of any questions or errors within 30 days after the date of delivery of the Report.

5. CBRE assumes no responsibility (including any obligation to procure the same) for any documents, data or information not provided to CBRE, including without limitation any termite inspection, survey or occupancy permit.

6. All furnishings, equipment and business operations have been disregarded with only real property being considered in the Report, except as otherwise expressly stated and typically considered part of real property.

7. Any cash flows included in the analysis are forecasts of estimated future operating characteristics based upon the information and assumptions contained within the Report. Any projections of income, expenses and economic conditions utilized in the Report, including such cash flows, should be considered as only estimates of the expectations of future income and expenses as of the date of the Report and not predictions of the future. Actual results are affected by a number of factors outside the control of CBRE, including without limitation fluctuating economic, market, and property conditions. Actual results may ultimately differ from these projections, and CBRE does not warrant any such projections.

8. The Report contains professional opinions and is expressly not intended to serve as any warranty, assurance or guarantee of any particular value of the subject property. Other appraisers may reach different conclusions as to the value of the subject property. Furthermore, market value is highly related to exposure time, promotion effort, terms, motivation, and conclusions surrounding the offering of the subject property. The Report is for the sole purpose of providing the intended user with CBRE's independent professional opinion of the value of the subject property as of the date of the Report. Accordingly, CBRE shall not be liable for any losses that arise from any investment or lending decisions based upon the Report that the client, intended user, or any buyer, seller, investor, or lending institution may undertake related to the subject property, and CBRE has not been compensated to assume any of these risks. Nothing contained in the Report shall be construed as any direct or indirect recommendation of CBRE to buy, sell, hold, or finance the subject property.

9. No opinion is expressed on matters which may require legal expertise or specialized investigation or knowledge beyond that customarily employed by real estate appraisers. Any user of the Report is advised to retain experts in areas that fall outside the scope of the real estate appraisal profession for such matters.

10. CBRE assumes no responsibility for any costs or consequences arising due to the need, or the lack of need, for flood hazard insurance. An agent for the Federal Flood Insurance Program should be contacted to determine the actual need for Flood Hazard Insurance.

11. Acceptance or use of the Report constitutes full acceptance of these Assumptions and Limiting Conditions and any special assumptions set forth in the Report. It is the responsibility of the user of the Report to read in full, comprehend and thus become aware of all such assumptions and limiting conditions. CBRE assumes no responsibility for any situation arising out of the user's failure to become familiar with and understand the same.

12. The Report applies to the property as a whole only, and any pro ration or division of the title into fractional interests will invalidate such conclusions, unless the Report expressly assumes such pro ration or division of interests.



13. The allocations of the total value estimate in the Report between land and improvements apply only to the existing use of the subject property. The allocations of values for each of the land and improvements are not intended to be used with any other property or appraisal and are not valid for any such use.

14. The maps, plats, sketches, graphs, photographs, and exhibits included in this Report are for illustration purposes only and shall be utilized only to assist in visualizing matters discussed in the Report. No such items shall be removed, reproduced, or used apart from the Report.

15. The Report shall not be duplicated or provided to any unintended users in whole or in part without the written consent of CBRE, which consent CBRE may withhold in its sole discretion. Exempt from this restriction is duplication for the internal use of the intended user and its attorneys, accountants, or advisors for the sole benefit of the intended user. Also exempt from this restriction is transmission of the Report pursuant to any requirement of any court, governmental authority, or regulatory agency having jurisdiction over the intended user, provided that the Report and its contents shall not be published, in whole or in part, in any public document without the written consent of CBRE, which consent CBRE may withhold in its sole discretion. Finally, the Report shall not be made available to the public or otherwise used in any offering of the property or any security, as defined by applicable law. Any unintended user who may possess the Report is advised that it shall not rely upon the Report or its conclusions and that it should rely on its own appraisers, advisors and other consultants for any decision in connection with the subject property. CBRE shall have no liability or responsibility to any such unintended user.



ADDENDA

Addendum A

# LAND SALE SUMMARIES

## Sale                    Land - Other/Sustainability                    No. 1

| | | |
|---|---|---|
| Property Name | N/A | |
| Address | 19 Lyman Road | |
| | Berlin, MA 01503 | |
| | United States | |

| | |
|---|---|
| Government Tax Agency | Middlesex |
| Govt./Tax ID | 9-41 |

**Site/Government Regulations**

| | Acres | Square feet |
|---|---|---|
| Land Area Net | 59.540 | 2,593,562 |
| Land Area Gross | 59.540 | 2,593,562 |

| | |
|---|---|
| Site Development Status | Raw |
| Shape | Irregular |
| Topography | Varies |
| Utilities | N/A |

| | |
|---|---|
| Maximum FAR | N/A |
| Min Land to Bldg Ratio | N/A |
| Maximum Density | N/A |

| | |
|---|---|
| General Plan | N/A |
| Specific Plan | N/A |
| Zoning | Residential Agriculture (RA) |
| Entitlement Status | N/A |

### Sale Summary

| | | | |
|---|---|---|---|
| Recorded Buyer | Town of Berlin | Marketing Time | N/A |
| True Buyer | N/A | Buyer Type | N/A |
| Recorded Seller | Sudbury Valley Trs Inc | Seller Type | N/A |
| True Seller | N/A | Primary Verification | Public Records |
| | | | |
| Interest Transferred | Fee Simple/Freehold | Type | Sale |
| Current Use | N/A | Date | 11/8/2022 |
| Proposed Use | Open Space/Conservation | Sale Price | $1,150,000 |
| Listing Broker | N/A | Financing | All Cash |
| Selling Broker | N/A | Cash Equivalent | $1,150,000 |
| Doc # | N/A | Capital Adjustment | $0 |
| | | Adjusted Price | $1,150,000 |

### Transaction Summary plus Five-Year CBRE View History

| Transaction Date | Transaction Type | Buyer | Seller | Price | Price/ac and /sf |
|---|---|---|---|---|---|
| 11/2022 | Sale | Town of Berlin | Sudbury Valley Trs Inc | $1,150,000 | $19,315 / $0.44 |



## Sale | Land - Other/Sustainability | No. 1

### Units of Comparison

$0.44 / sf        N/A / Unit

$19,314.75 / ac        N/A / Allowable Bldg. Units

N/A / Building Area

### Financial

**No information recorded**

### Map & Comments

This comparable is an undeveloped 59.54-acre parcel of land located at 19 Lyman Road in Berlin, Massachusetts. The raw parcel is zoned Residential Agriculture (RA) and was acquired by the town of Berlin with the intention of preserving the land for conservation purposes. The town secured funding for the acquisition through the Community Preservation Act and state funding through the Municipal Vulnerability Preparedness Awards. The property sold in November 2022 for $1,150,000 or $19,315 per acre.

Google    Map data ©2024



## Sale — Land - Conservation Easement — No. 2

| Property Name | Conservation Land |
| Address | 66 Hardy Road |
| | Ashburnham, MA 01430 |
| | United States |
| Government Tax Agency | Worcester |
| Govt./Tax ID | 43-8, 43-1, 43-7 |

**Site/Government Regulations**

| | Acres | Square feet |
|---|---|---|
| Land Area Net | 134.300 | 5,850,108 |
| Land Area Gross | 134.300 | 5,850,108 |

| Site Development Status | Raw |
| Shape | Irregular |
| Topography | Rolling |
| Utilities | Minimal |

| Maximum FAR | N/A |
| Min Land to Bldg Ratio | N/A |
| Maximum Density | N/A |

| General Plan | N/A |
| Specific Plan | N/A |
| Zoning | GB |
| Entitlement Status | Other (See Comments) |

### Sale Summary

| Recorded Buyer | Commonwealth of Massachusetts | Marketing Time | N/A |
| True Buyer | N/A | Buyer Type | Other |
| Recorded Seller | North County Land Trust, Inc. | Seller Type | Corporation |
| True Seller | N/A | Primary Verification | Public Record, Press Release |
| | | | |
| Interest Transferred | Fee Simple/Freehold | Type | Sale |
| Current Use | Conservation | Date | 6/15/2022 |
| Proposed Use | None | Sale Price | $995,000 |
| Listing Broker | N/A | Financing | N/A |
| Selling Broker | Keith Ross @ LandVest | Cash Equivalent | $995,000 |
| Doc # | 10356/56 | Capital Adjustment | $0 |
| | | Adjusted Price | $995,000 |

### Transaction Summary plus Five-Year CBRE View History

| Transaction Date | Transaction Type | Buyer | Seller | Price | Price/ac and /sf |
|---|---|---|---|---|---|
| 06/2022 | Sale | Commonwealth of Massachusetts | North County Land Trust, Inc. | $995,000 | $7,409 / $0.17 |



## Sale | Land - Conservation Easement | No. 2

### Units of Comparison

| | | | |
|---|---|---|---|
| $0.17 / sf | | N/A / Unit | |
| $7,408.79 / ac | | N/A / Allowable Bldg. Units | |
| | | N/A / Building Area | |

### Financial

**No information recorded**

### Map & Comments



66 Hardy Road, 0 Hardy Road, and 102 Rindge State Road reflect three parcels of land and over 134 acres that sold for conservation in June of 2022 to the Commonwealth of Massachusetts. The seller, North County Land Trust Inc., has been indicated as a non-profit that specializes in land conservation. The seller previously acquired the lands in January 2021 from private parties for $1,300,000 (Book 9588, Page 0212). The reduction in value implying a negative 23% variance between the total acquisition price of the lands and the most recent sale price of the lands to the Commonwealth of Massachusetts.

**CBRE**

## Sale                     Land - Other/Sustainability                     No. 3

| | |
|---|---|
| Property Name | N/A |
| Address | Rear 27 Worcester Road |
| | Princeton, MA 01541 |
| | United States |
| Government Tax Agency | Town of Princeton |
| Govt./Tax ID | Map 12D Parcel 15 |



### Site/Government Regulations

| | Acres | Square feet |
|---|---|---|
| Land Area Net | 16.400 | 714,384 |
| Land Area Gross | N/A | N/A |

| | |
|---|---|
| Site Development Status | Platted |
| Shape | N/A |
| Topography | Rolling |
| Utilities | E, T |

| | |
|---|---|
| Maximum FAR | N/A |
| Min Land to Bldg Ratio | N/A |
| Maximum Density | N/A |

| | |
|---|---|
| Frontage Distance/Street | N/A  ROW Access |

| | |
|---|---|
| General Plan | N/A |
| Specific Plan | N/A |
| Zoning | Residential |
| Entitlement Status | N/A |

### Sale Summary

| | | | |
|---|---|---|---|
| Recorded Buyer | Anne B. Littlefield | Marketing Time | N/A |
| True Buyer | N/A | Buyer Type | Private Investor |
| Recorded Seller | Fieldstone Farm LLC | Seller Type | Private Investor |
| True Seller | N/A | Primary Verification | N/A |
| | | | |
| Interest Transferred | Fee Simple/Freehold | Type | Sale |
| Current Use | Back Land | Date | 4/9/2019 |
| Proposed Use | Abutter Protection | Sale Price | $99,000 |
| Listing Broker | N/A | Financing | All Cash |
| Selling Broker | N/A | Cash Equivalent | $99,000 |
| Doc # | Book 60250 Page 356 | Capital Adjustment | $0 |
| | | Adjusted Price | $99,000 |

### Transaction Summary plus Five-Year CBRE View History

| Transaction Date | Transaction Type | Buyer | Seller | Price | Price/ac and /sf |
|---|---|---|---|---|---|
| 04/2019 | Sale | Anne B. Littlefield | Fieldstone Farm LLC | $99,000 | $6,037 / $0.14 |



## Sale | Land - Other/Sustainability | No. 3

### Units of Comparison

| | |
|---|---|
| $0.14 / sf | N/A / Unit |
| $6,036.59 / ac | N/A / Allowable Bldg. Units |
| | N/A / Building Area |

### Financial

**No information recorded**

### Map & Comments



Map data ©2024

This comparable is the April 2019 purchase by an abutter of a rolling 16.40-acre site to the rear of 27 Worcester Road just south of the center of Princeton, MA.

An entity known as Fieldhouse Farm LLC sold the property to Ann B. Littlefield for $99,000 or $6,037 per acre. The site, which has right of way access across the buyer's house lot, borders on State conservation land.

CBRE

| Sale | Land - Other/Sustainability | No. 4 |
|---|---|---|

| Property Name | N/A |
|---|---|
| Address | Claimant Hill Road |
| | Princeton, MA 01452 |
| | United States |
| | |
| Government Tax Agency | Town of Princeton |
| Govt./Tax ID | N/A |

**Site/Government Regulations**

| | Acres | Square feet |
|---|---|---|
| Land Area Net | 99.792 | 4,346,946 |
| Land Area Gross | N/A | N/A |

| Site Development Status | Finished |
|---|---|
| Shape | Irregular |
| Topography | Rolling |
| Utilities | E, T, |

| Maximum FAR | N/A |
|---|---|
| Min Land to Bldg Ratio | N/A |
| Maximum Density | N/A |

| Frontage Distance/Street | 872 ft Claimant Hill Road |
|---|---|

| General Plan | N/A |
|---|---|
| Specific Plan | N/A |
| Zoning | Rural Residential |
| Entitlement Status | N/A |



### Sale Summary

| Recorded Buyer | The Commonwealth of Massachusetts DCR | Marketing Time | N/A |
|---|---|---|---|
| True Buyer | N/A | Buyer Type | Other |
| Recorded Seller | The Jean A. Krag Trust | Seller Type | End User |
| True Seller | N/A | Primary Verification | Public Records |
| | | | |
| Interest Transferred | Fee Simple/Freehold | Type | Sale |
| Current Use | Vacant - Forested | Date | 3/23/2018 |
| Proposed Use | Conservation | Sale Price | $285,000 |
| Listing Broker | N/A | Financing | All Cash |
| Selling Broker | N/A | Cash Equivalent | $285,000 |
| Doc # | Book 58575 Page 291 | Capital Adjustment | $0 |
| | | Adjusted Price | $285,000 |

### Transaction Summary plus Five-Year CBRE View History

| Transaction Date | Transaction Type | Buyer | Seller | Price | Price/ac and /sf |
|---|---|---|---|---|---|
| 03/2018 | Sale | The Commonwealth of Massachusetts DCR | The Jean A. Krag Trust | $285,000 | $2,856 / $0.07 |

CBRE

## Sale — Land - Other/Sustainability — No. 4

### Units of Comparison

| | |
|---|---|
| $0.07  / sf | N/A  / Unit |
| $2,855.94  / ac | N/A  / Allowable Bldg. Units |
| | N/A  / Building Area |

### Map & Comments



Sale of a formerly agricultural parcel of land to the state which has a concerted effort to preserve land on the headwaters of the Wachusett Reservoir.



Addendum B

# SURVEY AND TEMPORARY AREA MEASUREMENT



Addendum C

# CONSERVATION EASEMENT

13 g



Bk: 60513 Pg: 485   Doc: REST
Page: 1 of 13   11/19/2012 10:56 AM

Lincoln CR # 136
**CONSERVATION RESTRICTION**
**TO TOWN OF LINCOLN**
**City of Cambridge Property (Former DeNormandie Property), Cambridge Turnpike, Lincoln**

I.  **GRANTOR CLAUSE:**
The CITY of CAMBRIDGE, a municipal corporation, its successors and assigns ("Grantor"), acting pursuant to Sections 31, 32 and 33 of Chapter 184 of the Massachusetts General Laws, grant, with quitclaim covenants, to the   LINCOLN   CONSERVATION   COMMISSION, having a mailing address of  Box 6328, Lincoln Center, Massachusetts 01773, and its successors and permitted assigns (the "Grantee") by authority of MGL c 40sec 8C in perpetuity and exclusively for conservation purposes, the following described Conservation Restriction on two parcels of land located at 0 Cambridge Turnpike in the Town of Lincoln, Massachusetts, which parcels contains approximately 53.6 acres **(Assessors Map/Parcel 30-3 and 30-6)**, said parcels ("The Premises") described more fully as "Lot A" on a plan  entitled "Conservation Restriction Plan in Lincoln, Massachusetts" dated October 18, 2012 prepared by Snelling & Hamel Inc., recorded as plan **846** of 2012, a reduced copy of which is attached hereto as **Exhibit A** and incorporated herein by reference ("the Plan").  For Grantor's title see Middlesex Registry Book 59813, Page 111.

II.  **PURPOSES:**
The Premises contain outstanding qualities (collectively conservation values) of wetlands, watershed lands, and scenic forested lands, the protection of which in their predominantly natural condition will benefit the public through:

> 1) the protection of important Zone A watershed lands for the City of Cambridge Reservoir;
> 2) the preservation of an important forested landscape, as part of a much larger protected area of forest, , wetland, pond, stream and watershed lands, including the adjacent Ricci public conservation land, and the D'Arrigo conservation lands;
> 3) the enhancement of scenic vistas from adjacent conservation lands and trails;
> 4) the preservation and enhancement of naturalized vistas from Cambridge Turnpike in the Town of Lincoln, Massachusetts ;
> 5) the preservation of an important wildlife corridor as part of a much larger protected area including Ricci conservation land, D'Arrigo conservation land and additional City of Cambridge watershed protection lands
> 6) the protection of important wildlife habitat including wetland, pond, forest and stream ecosystems.

III.  **PROHIBITED ACTS AND USES, EXCEPTIONS THERETO, AND PERMITTED USES:**

> A.  Prohibited Acts and Uses.  Subject to the exceptions set forth in Paragraph B below, the Grantor shall not perform nor allow the following acts and uses which are prohibited below, above or on the Premises:

*Return to:*
*Arthur Goldberg, Esq.*
*City of Cambridge*
*795 Massachusetts Ave*
*Cambridge, MA  02139*

1. Constructing or placing of any temporary or permanent building or any tennis court, landing strip, mobile home, swimming pool, asphalt or concrete pavement, sign, fence, billboard or other advertising display, antenna, utility pole, tower, including cell towers, conduit, line or other temporary or permanent structure or facility on, above or under the Premises, except for temporary or permanent structures necessary for watershed management;

2. Mining, excavating, dredging or removing from the Premises of soil, loam, peat, gravel, sand, rock or other mineral resource or natural deposit or otherwise make topographical changes to the area unless consistent with watershed management practices;

3. Placing, filling, storing or dumping on the Premises of soil, refuse, trash, vehicle bodies or parts, rubbish, debris, junk, waste or other substance or material whatsoever, whether hazardous or otherwise, or the installation of underground storage tanks;

4. Cutting, removing or otherwise destroying trees, grasses or other vegetation on the Premises unless consistent with, soil and habitat conservation practices, watershed management or invasive species control conducted on the Premises;

5. Activities on the Premises detrimental to drainage, flood control, water conservation, water quality, erosion control, soil conservation or archeological conservation;

6. The parking, storage, maintenance, operation or use of snowmobiles, motorcycles, mopeds, all-terrain vehicles or any other motorized or non-motorized vehicles of any kind on the Premises except for vehicles necessary for public safety or watershed management.

7. The subdivision of the Premises including no portion of the Premises may be used towards zoning requirements on this or any adjacent parcel

8. Any other uses of the Premises or activity thereon that is inconsistent with the purpose of this Conservation Restriction or that would materially impair its conservation interests.

B. Reserved Rights and Exceptions to Otherwise Prohibited Acts and Uses. The following acts and uses unless otherwise prohibited in Paragraph A above are permitted on the Premises if and only if 1) such acts or uses do not materially impair the conservation interests that are the subject of this Conservation Restriction, and 2) such activities are undertaken in accordance with any laws, rules and regulations associated therewith:

1. Non-commercial use of the Premises for passive outdoor recreation, education or research;

2. Excavation and removal (with restoration) from the Premises of soil, gravel, or other mineral resource or natural deposit as may be incidental to the maintenance of good drainage, soil conservation or watershed management practices including the construction and maintenance of stormwater detention basin (s) by the MA

3

Department of Transportation to control runoff from Route 2 in the designated "Reserve Area" as shown on the attached Plan (Detail B);

3. Selective cutting of vegetation for invasive species management or watershed management;

4. Acts consistent with the pre-existing utility easement of Algonquin Gas Transmission Company recorded in Middlesex South District Registry of Deeds, Book 26575, Page 173.

C. **Permitted Acts and Uses.** All acts and uses not prohibited by Paragraphs A and B above are permissible on the Premises, provided they do not materially impair the conservation values that are the subject of this Conservation Restriction.

## IV. LEGAL REMEDIES OF THE GRANTEE:

A. Legal and Injunctive Relief

The rights hereby granted shall include the right to enforce this Conservation Restriction by appropriate legal proceedings and to obtain injunctive and other equitable relief against any violations, including, without limitation, relief requiring restoration of the Premises to its condition prior to the time of the injury complained of (it being agreed that the Grantee will have no adequate remedy at law), and shall be in addition to, and not in limitation of, any other rights and remedies available to the Grantee.

The Grantor and Grantee agree that the Lincoln Land Conservation Trust has provided good and valuable assistance in the creation of this Conservation Restriction, and shall be deemed and recognized as being benefitted by it and having the right to enforce all of the terms of this Conservation Restriction. Such right shall only be exercised after sixty (60) days prior written notice to Grantee and Grantee's failure to so enforce.

B. Non - Waiver

Enforcement of the terms of this Conservation Restriction shall be at the discretion of Grantee. Any election by the Grantee as to the manner and timing of its right to enforce this Conservation Restriction or otherwise exercise its rights hereunder shall not be deemed or construed to be a waiver of such rights.

C. Grantee Disclaimer of Liability

By its acceptance of this Conservation Restriction, the Grantee does not undertake any liability or obligation relating to the condition of the Premises pertaining to compliance with and including, but not limited to, hazardous materials, zoning, environmental laws and regulations, or acts not caused by the Grantee or its agents.

D. Severability Clause

If any provisions of this Conservation Restriction shall to any extent be held invalid, the remainder shall not be affected.

4

**V. ACCESS:**

This Conservation Restriction hereby conveyed does not grant to the Grantee, to the general public, or to any other person any right to enter upon the Premises except the Grantee and its representatives are granted the right to enter at reasonable times and in a reasonable manner for the purpose of inspecting the same to determine compliance herewith.

**VI. EXTINGUISHMENT:**

**A. Grantee's Receipt of Property Right**

The Grantor and the Grantee agree that the donation of this Conservation Restriction gives rise to a real property right, immediately vested in the Grantee, with a fair market value that is at least equal to the proportionate value that this Conservation Restriction determined at the time of the gift bears to the value of the unrestricted Premises at that time.

**B. Value of Grantee's Property Right**

Such proportionate value of the Grantee's property right shall remain constant.

**C. Right of Grantee to recover Proportional Value at Disposition.**

If any occurrence ever gives rise to extinguishment or other release of the Conservation Restriction under applicable law, then the Grantee, on a subsequent sale, exchange or involuntary conversion of the Premises, shall be entitled to a portion of the proceeds equal to such proportionate value, subject, however, to any applicable law which expressly provides for a different disposition of proceeds, after complying with any gift, grant or funding requirements.

**D. Grantor/Grantee Cooperation Regarding Public Action**

Whenever all or any part of the Premises or any interest therein is taken by public authority under power of eminent domain or other act of public authority, then the Grantor and the Grantee shall cooperate in recovering the full value of all direct and consequential damages resulting from such action.

**E. Allocation of Expenses upon Disposition**

All related expenses incurred by the Grantor and the Grantee shall first be paid out of any recovered proceeds, and the remaining proceeds shall be distributed between the Grantor and Grantee in shares equal to such proportionate value.

**F. Continuing Trust of Grantee's Share of Proceeds of Conservation Restriction Disposition**

The Grantee shall use its share of the proceeds in a manner consistent with the conservation purposes of this grant.

**VII. ASSIGNABILITY:**

5

A. Running of the Burden

The burdens of this Conservation Restriction shall run with the Premises in perpetuity, and shall be enforceable against the Grantor and the successors and assigns of the Grantor holding any interest in the Premises.

B. Execution of Instruments

The Grantee is authorized to record or file any notice or instruments appropriate to assure the perpetual enforceability of this Conservation Restriction. Without limiting the foregoing, the Grantor and their successors and assigns agree to execute any such instruments upon request.

C. Running of the Benefit

The benefits of this Conservation Restriction shall run to the Grantee, shall be in gross and shall not be assignable by the Grantee, except in the following instances and from time to time:

(i.) as a condition of any assignment, the Grantee requires that the purposes of this Conservation Restriction continue to be carried out;

(ii.) the assignee, at the time of assignment, qualifies under Section 170(h) of the Internal Revenue Code of 1986, as amended, and applicable regulations thereunder, and under Section 32 of Chapter 184 of the General Laws as an eligible donee to receive this Conservation Restriction directly, and

(iii.) Grantee complies with the provisions required by Article 97 of the Amendments to the State Constitution, if applicable.

VIII. SUBSEQUENT TRANSFERS:

The Grantor agrees to incorporate by reference the terms of this Conservation Restriction in any deed or other legal instrument by which they divest themselves of any interest in all or a portion of the Premises, including a leasehold interest. Failure to do so shall not impair this Conservation Restriction or its enforceability in any manner.

IX. ESTOPPEL CERTIFICATE:

Upon request by the Grantor, the Grantee shall within twenty (20) days execute and deliver to the Grantor any document, including an estoppel certificate, which certifies the Grantor's compliance with any obligation of the Grantor contained in this Conservation Restriction.

X. EFFECTIVE DATE:

This Conservation Restriction shall be effective when the Grantor and the Grantee have executed it, the administrative approvals required by Section 32 of Chapter 184 of the General Laws have been obtained, and it has been recorded.

6

XI.   **RECORDATION:**

The Grantor shall record this instrument in timely fashion in the Middlesex South Registry of Deeds.

Executed under seal this _20_ day of _August_ , 2012

At a public meeting held on _June_ the _18_ , _2012_ voted to grant this CR (Exhibit C Attested vote of Cambridge City Council)

GRANTOR

_____

CITY OF CAMBRIDGE, GRANTOR
By:  Robert W. Healy, City Manager

Approved as to form:

_____

Nancy E. Glowa, Acting City Solicitor

COMMONWEALTH OF MASSACHUSETTS

Middlesex, ss.                                    _August 20_ , 2012

On this _20_ day of _August_ , 2012, before me, the undersigned notary public, personally appeared _Robert W. Healy_ , proved to me through satisfactory evidence of identification, which were _personally Known_ , to be the persons whose names are signed on the preceding or attached document in my presence.

_____
Notary Public

My Commission Expires:_____



DONNA P. LOPEZ
Notary Public
Commonwealth of Massachusetts
My Commission Expires August 12, 2016

7

## ACCEPTANCE OF GRANT

At a Public Meeting held on 9/5/12 , it was voted to accept the above Conservation Restriction which is accepted this 6th day of September , 2012

_____
LINCOLN CONSERVATION COMMISSION, GRANTEE
*Peter Von Mertens*

_____
LINCOLN CONSERVATION COMMISSION, GRANTEE
*James Meadors*

_____
LINCOLN CONSERVATION COMMISSION, GRANTEE
*Robert Noah*

_____
LINCOLN CONSERVATION COMMISSION, GRANTEE
*Diana Beaudoin*

_____
LINCOLN CONSERVATION COMMISSION, GRANTEE
*Julia Dobrow*

_____
LINCOLN CONSERVATION COMMISSION, GRANTEE
*Arthur Kurtz*

_____
LINCOLN CONSERVATION COMMISSION, GRANTEE


## COMMONWEALTH OF MASSACHUSETTS

Middlesex, ss.                                    9/6          , 2012

On this 6 day of September , 2012, before me, the undersigned notary public, personally appeared Lincoln Con Com members , proved to me through satisfactory evidence of identification, which were personally known , to be the persons whose names are signed on the preceding or attached document in my presence.

Peter Von Mertens
James Meadors
Robert Noah
Diana Beaudoin
Julie Dobrow
Arthur Kurtz

_____
Notary Public

My Commission Expires: 3/10/2017

PATRICE A. BRENNAN
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires
March 10, 2017

8

## APPROVAL BY SELECTMEN

We, the undersigned being a majority of the Selectmen of the Town of Lincoln, Massachusetts, hereby certify that at a public meeting duly held on _September 18_ 2012 the Selectmen voted to approve and accept the foregoing Conservation Restriction to the Lincoln Conservation Commission t pursuant to M.G.L.c.184, § 32

Selectmen:

## COMMONWEALTH OF MASSACHUSETTS

Middlesex, ss.                                        _____, 2012

On this _10th_ day of _September_, 2012, before me, the undersigned notary public, personally appeared _Peter Brown, Noah Eckhouse, Renel Fredrikson_, proved to me through satisfactory evidence of identification, which were _personally known to me_ to be the persons whose names are signed on the preceding or attached document in my presence.

_____
Notary Public

My Commission Expires: ___7/26/13___

ANITA M. SCHEIPERS
Notary Public
Commonwealth of Massachusetts
My Commission Expires
July 26, 2013

9

## APPROVAL BY SECRETARY OF ENERGY and ENVIRONMENTAL AFFAIRS
## COMMONWEALTH OF MASSACHUSETTS

The undersigned, Secretary of the Executive Office of Energy and Environmental Affairs of the Commonwealth of Massachusetts, hereby certifies that the foregoing Conservation Restriction to the Lincoln Land Conservation Trust has been approved in the public interest pursuant to M.G.L. c. 184, §32. Said approval is not to be construed as representing the existence or non-existence of any pre-existing rights of the public, if any, in and to the Premises, and any such pre-existing rights of the public, if any, are not affected by the granting of this Conservation Restriction.

Date: 11 7 , 2012

Secretary of Energy and Environmental Affairs

## COMMONWEALTH OF MASSACHUSETTS

Suffolk , ss.                                            Nov 7 , 2012

On this 7th day of November , 2012, before me, the undersigned notary public, personally appeared Richard K. Sullivan, Jr. , proved to me through satisfactory evidence of identification, which were personally known to me be the persons whose names are signed on the preceding or attached document in my presence.

Notary Public

My Commission Expires: 12 7 2018

**10**

# EXHIBIT A



CONSERVATION RESTRICTION PLAN
LINCOLN, MASSACHUSETTS
1 INCH = 100 FEET   OCTOBER 18, 2012

SNELLING & HAMEL ASSOCIATES, INC.
PROFESSIONAL LAND SURVEYORS & ENGINEERS
10 LEWIS STREET  P.O. BOX 102
LINCOLN, MASSACHUSETTS  01773
(781) 259-0071

OWNER OF RECORD:
CITY OF CAMBRIDGE
BK.56013 PG.111

LOT "A"
53.6 ± ACRES
(TOTAL AREA)

ASSESSOR'S MAP 30
PARCELS 3 & 6

DETAIL "A"
(NOT TO SCALE)

SEE DETAIL "A"

DETAIL "D"
(NOT TO SCALE)

CAMBRIDGE TURNPIKE

CAMBRIDGE TURNPIKE

OCTOBER 18, 2012



# City of Cambridge

Agenda Item No. 28B
Calendar item #1

**IN CITY COUNCIL**

June 11, 2012
June 18, 2012

ORDERED:   That the City Council, pursuant to Section 2.110.010(g) of the Cambridge Municipal Code, by a two-thirds vote order that the City Council shall utilize a diminished process for the disposition of a Conservation Restriction that will protect approximately 53.6 acres of land in the City's watershed to be acquired by the City in the Town of Lincoln, Massachusetts located at 0 Cambridge Turnpike (Lincoln Assessors' parcel #30-3-0 and #30-6-0).

In City Council June 18, 2012
Adopted by a yea and nay vote:-
Yeas 8; Nays 1; Absent 0; Present 0.
Attest:- Donna P. Lopez, Interim City Clerk

A true copy;

ATTEST:-    *Donna P. Lopez*

Donna P. Lopez, Interim City Clerk



# City of Cambridge

~~Agenda Item No. 28C~~
Calendar item #1

**IN CITY COUNCIL**

~~June 11, 2012~~
June 18, 2012

ORDERED:    That the City Council, pursuant to Section 2.110.010 of the Cambridge
Municipal Code and any other applicable laws, by a two-thirds vote, authorize
the City Manager to grant, on behalf of the City of Cambridge, a permanent
conservation restriction to the Lincoln Conservation Commission, as provided
by G.L. c. 184, §§ 31-33, for the purposes of water supply protection and land
conservation, and to execute and deliver said conservation restriction in such .
form and substance as the City Manager determines is necessary or appropriate.

In City Council June 18, 2012
Adopted by a yea and nay vote:-
Yeas 8; Nays 1; Absent 0; Present 0.
Attest:- Donna P. Lopez, Interim City Clerk

A true copy;

ATTEST:-    *Donna P. Lopez*

Donna P. Lopez, Interim City Clerk

BK 26575 PG 173

GRANT OF EASEMENT

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF MIDDLESEX

TRACT NO. J-3-8.1



KNOW ALL MEN BY THESE PRESENTS:  that the undersigned Thomas L. DeNormandie of 11 Old Concord Road, Lincoln, Massachusetts 01773, Katherine B. DeNormandie-McCarey f/k/a Katherine B. DeNormandie of 23 Pickney Street, Boston, Massachusetts 02114 and Victoria L. DeNormandie-Lochiatto f/k/a Victoria L. DeNormandie of 29 High Bank Road, Franklin, Massachusetts 02038, (hereinafter called "Grantor", whether one or more) for and in consideration of the sum of Ten Dollars ($10.00) paid by ALGONQUIN GAS TRANSMISSION COMPANY, a Delaware corporation having its principal place of business at 1284 Soldiers Field Road, Boston, Massachusetts (hereinafter called "Grantee") the receipt and sufficiency of which is hereby acknowledged, does hereby give, grant and convey with QUITCLAIM COVENANTS unto Grantee, its successors and assigns, subject to the limitations and reservations herein stated, a permanent right of way and easement for the purpose of laying, constructing, maintaining, operating, altering, replacing, repairing, abandoning and removing a pipeline or pipelines with above or below grade valves, tie-overs, meters, regulators, data acquisition and cathodic protection devices, pig-lanching and recovering devices, fenced enclosures, protective structures, buildings and other appurtenant facilities, all of which shall be and remain the property of Grantee, for the transmission of natural gas and all by-products thereof or any liquids, gases, or substances which can be transported through a pipeline, over, under, across, and upon the following described land (the "Right of Way") situated in the Town of Lincoln, County of Middlesex, Commonwealth of Massachusetts, more particularly described as follows:

The land described in deeds from James DeNormandie of Lincoln in the County of Middlesex, Commonwealth of Massachusetts to Grantor dated December 19, 1975 and January 2, 1976 recorded with the Middlesex (Southern District) Registry of Deeds in Book 12914, Page 604 and Book 12926, Page 720, respectively.  The undersigned Martha DeNormandie Executrix of the Estate of James DeNormandie joins in said grant for purposes of releasing to the Grantor and the Grantees as their interests may appear herein any remaining rights the undersigned may have to the land described in a deed recorded with said Registry of Deeds at Book 6068, Page 448.

The bounds of the permanent Right of Way and easement granted herein are as follows:  the bounds of the permanent Right of Way and easement across Tract J-3-8.1 are more particularly shown on the plan entitled Location of Easement Crossing Property of N/F James DeNormandie, Lincoln, massachusetts, Tract J-3-8.1, Drawing No. L-9599B,. dated 3/6/96, prepared by Vanasse Hangen Brustlin, Inc., 101 Walnut Street, Watertown, MA 02272, to be hereinafter recorded as Tract J-3-8.1 is affected hereby.  The portion of the Right of Way immediately adjacent to the public or private way now or formerly known as Route 2 Concord Turnpike as shown on said Plan shall not contain any permanent above grade structures installed by Grantee except as required by law.

The Grantee shall have all other rights and benefits necessary or convenient for the full enjoyment of use of the rights herein granted, including but not limited to, the right to remove, clear and to keep clear all buildings, walls or similar structures, above or below ground swimming pools, decks, rocks, trees, brush, limbs, and other obstructions including, but not limited to, pipelines and conduits which might interfere with the use of the Right of Way, and the free and full right of ingress and egress, over and across said Right of Way and easement.

All pipelines shall be buried to a depth required by applicable laws and regulations.



BK 26575 PG 174

Grantor shall not grade, excavate, fill or flood the Right of Way without obtaining the Grantee's prior written consent, which consent may not be unreasonably withheld.

The rights, title and privileges herein granted may, in whole or in part, be sold, leased, assigned, pledged and mortgaged, and shall be binding upon and inure to the benefit of the parties hereto, their respective heirs, executors, administrators, successors, assigns and legal representatives.

The failure of Grantee to exercise any rights herein conveyed in any single instance shall not be considered a waiver of such right or rights and shall not bar Grantee from exercising such right or rights, or if necessary, seeking an appropriate remedy in conjunction with such right or rights.

Grantor understands and agrees that the person securing this grant is without authority from Grantee to make any agreement in respect of the subject matter hereof not herein expressed.

IN WITNESS WHEREOF Grantors have hereunto set their respective hands and seals this _29th_ day of _July_ A. D., 1996.

_____        _____ L.S.
                               Thomas L. DeNormandie

_____        _____ L.S.
                               Katherine B. DeNormandie-McCarey
                               f/k/a Katherine B. DeNormandie

_____        _____ L.S.
                               Victoria L. DeNormandie-Lochiatto
                               f/k/a Victoria L. DeNormandie

_____        _____ L.S.
                               Martha DeNormandie
                               Executrix of the Estate of
                               James DeNormandie

DeNormandie

K:\jmb1\78aasmnt.alg

BK 26575 PG 175

**INDIVIDUAL**

**COMMONWEALTH OF MASSACHUSETTS**

Middlesex County

ss.      23rd day of July , A.D., 1996

Then personally appeared the above-named Thomas L. Devereaux, Jr.

Katherine R. Devereaux, Vivian L. Devereaux, Lisa White, and Pamela Devereaux

signer and acknowledged the foregoing instrument to be ___ free act and deed, before me.

Notary Public

My Commission expires  1/8/ 19 99

---

**INDIVIDUAL**

**COMMONWEALTH OF MASSACHUSETTS**

ss. _____, A.D., 19___

Then personally appeared the above-named _____

signer and acknowledged the foregoing instrument to be ___ free act and deed, before me.

Notary Public

My Commission expires _____ 19___

---

**COMMONWEALTH OF MASSACHUSETTS**

_____
_____
_____

**TO**

**ALGONQUIN GAS TRANSMISSION COMPANY**

**GRANT OF EASEMENT**

_____, 19___

at _____ o'clock _____ .M.

Received and entered with _____

Book _____ Page _____

*Please return to:*
Land Department
**ALGONQUIN GAS TRANSMISSION COMPANY**
1284 Soldiers Field Road
Boston, MA  02135

---

**CORPORATE**

**COMMONWEALTH OF MASSACHUSETTS**

ss. _____, A.D., 19___

Then personally appeared the above-named _____

and acknowledged the foregoing instrument to be the free act and deed of the _____

Notary Public

My Commission expires _____ 19___

ATTEST:
REGISTER

o4



Bk: 59813 Pg: 111    Doc: DEED
Page: 1 of 4    08/22/2012 11:16 AM

**Property Address: 0 Cambridge Turnpike, Lincoln, MA**

## QUITCLAIM DEED

We, VICTORIA DEN. LOCHIATTO, TRUSTEE of the VICTORIA DEN LOCHIATTO REALTY TRUST, u/d/t dated February 10, 2003 and recorded with the Middlesex Registry of Deeds in Book 38613, Page 423, and THOMAS DENORMANDIE of Lincoln, Middlesex County, Massachusetts, KATHERINE DENORMANDIE MCCAREY f/k/a Katherine DeNormandie a/k/a Katherine B. DeNormandie of Lexington, Middlesex County, Massachusetts, VICTORIA DENORMANDIE LOCHIATTO f/k/a Victoria DeNormandie a/k/a Victoria L. DeNormandie of Harvard, Worcester County, Massachusetts, as tenants in common, for consideration paid and in full consideration of ONE MILLION NINE HUNDRED THOUSAND DOLLARS AND 00/100 CENTS ($1,900,000.00) grant to the CITY OF CAMBRIDGE, under the control of the Cambridge Water Board through its Chief Superintendent for the purposes of drinking water supply protection and land conservation, with an address of 795 Massachusetts Avenue, Cambridge, Massachusetts 02139,

with QUITCLAIM COVENANTS,

the land, together with the buildings thereon, situated in Lincoln, Middlesex County, Massachusetts being shown as "Lot A" on a plan entitled, "Plan of Land in Lincoln, Massachusetts" by Snelling & Hamel Associates, Inc., Professional Land Surveyors & Engineers, dated July 24, 2012, recorded herewith as Plan No. 57౽ of 2012, to which reference is hereby made for a more particular description of "Lot A".

Lot A containing 53.6 acres, more or less, according to said plan.

Said premises are conveyed subject to and together with any and all liens and encumbrances of record, insofar as the same are now in force and applicable.

The Grantors hereby certify that the premises hereby conveyed is not homestead property.

For title, see following deeds all recorded with the Middlesex South Registry of Deeds: deed dated February 10, 2003 and recorded in Book 38613, Page 427, deed dated September 8, 2003 and recorded in Book 41388, Page 578, deed dated December 19, 1975 and recorded in Book 12914, Page 604 and deed dated January 2, 1976 and recorded in Book 12926, Page 720.

JEFFREY L. ONTELL, ESQ.
MARSH, MORIARTY, ONTELL & GOLDER, P.C.
18 TREMONT STREET, SUITE 900
BOSTON, MA 02108

WITNESS our hands and seals this ___18___ day of August, 2012.


_Victoria DeN. LoChiatto_
Victoria DeN. LoChiatto, Trustee of the Victoria
DeN LoChiatto Realty Trust


_Victoria DeN LoChiatto_
Victoria DeNormandie LoChiatto, Individually


## COMMONWEALTH OF MASSACHUSETTS

Middlesex ___ , ss.

On this __18__ day of August, 2012, before me, the undersigned notary public, personally appeared
VICTORIA DENORMANDIE LOCHIATTO,  proved to me through satisfactory evidence of
identification, which was _____MADL_____, to be the person whose name is
signed on the preceding or attached document, and acknowledged to me that she signed it voluntarily for
its stated purpose.

Laurie B. Maniachi
Notary Public
Commonwealth of Massachusetts
My Commission Expires
February 13, 2015

_Laurie B. Maniachi_
Notary Public:
My Commission Expires: 2-13-2015


## COMMONWEALTH OF MASSACHUSETTS

Middlesex ___ , ss.

On this __18__ day of August, 2012, before me, the undersigned notary public, personally appeared
VICTORIA DEN. LOCHIATTO, AS TRUSTEE OF THE VICTORIA DEN LOCHIATTO REALTY
TRUST, proved to me through satisfactory evidence of identification, which was
____MADL_____, to be the person whose name is signed on the preceding
or attached document, and acknowledged to me that she signed it voluntarily for its stated purpose.

Laurie B. Maniachi
Notary Public
Commonwealth of Massachusetts
My Commission Expires
February 13, 2015

_Laurie B. Maniachi_
Notary Public:
My Commission Expires: 2-13-2015

_Thomas DeNormandie_

Thomas DeNormandie

## COMMONWEALTH OF MASSACHUSETTS

_Middlesex_, ss.

On this _18_ day of August, 2012, before me, the undersigned notary public, personally appeared THOMAS DENORMANDIE, proved to me through satisfactory evidence of identification, which was _Mass. Drivers License_____, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he signed it voluntarily for its stated purpose.

Sally D. Hill
Notary Public
Commonwealth of Massachusetts
My Commission Expires
October 5, 2018

Notary Public: _Sally D Hill_
My Commission Expires: _Oct 5, 2018_

_[signatures and acknowledgments continue on following page]_

_____
Katherine DeNormandie McCarey

COMMONWEALTH OF MASSACHUSETTS

_____ , ss.

On this _____ day of August, 2012, before me, the undersigned notary public, personally appeared KATHERINE DENORMANDIE MCCAREY, proved to me through satisfactory evidence of identification, which was _____, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that she signed it voluntarily for its stated purpose.

_____
Notary Public:
My Commission Expires:

_Katherine DeNormandie McCarey_

Katherine DeNormandie McCarey

## COMMONWEALTH OF MASSACHUSETTS

_Barnstable_ , ss.

On this _17th_ day of August, 2012, before me, the undersigned notary public, personally appeared KATHERINE DENORMANDIE McCAREY, proved to me through satisfactory evidence of identification, which was _MA Drivers License_ , to be the person whose name is signed on the preceding or attached document, and acknowledged to me that she signed it voluntarily for its stated purpose.

Notary Public:

My Commission Expires: _March 7, 2019_

Addendum D

# SUBJECT PHOTOS



View west along Route 2 at subject

View east along Route 2 at subject



View of proposed TWS area



Alternate view TWS area from access road



View of permanent gas easement



Alternate view of gas line infrastructure

Addendum E

# QUALIFICATIONS

# PROFILES



## Pro Affiliations / Accreditations

– MAI / AI-GRS The Appraisal Institute
– 2024 Board Member Appraisal Institute NH/VT Chapter
Certified General Appraiser
  - New Hampshire
  - Vermont
  - Massachusetts
  - Maine

## Education

– Bachelors in Finance University of Georgia
– Masters in Communications Boston University

VALUATION & ADVISORY SERVICES / NEW ENGLAND

# Garrett Gerstung, MAI, AI-GRS

**First Vice President, Boston**
**T**  +1 617 957 2747
**M**  +1 617 957 2747
**E**  garrett.gerstung@cbre.com

## Professional Experience

Garrett Gerstung has more than 20 years of experience in the commercial appraisal industry with valuation and consulting experience that includes common and specialty property types. Specialty property types previously appraised include Low Income Housing Tax Credit Apartments, Historic and Environmental Tax Credit and Diminution of Value assignments, Data Centers, Truck Terminals, Hotels, Golf Courses, Cold Storage Warehouses, and Life Science properties. Mr. Gerstung currently holds active licenses in the states of Massachusetts, Maine, New Hampshire and Vermont and has completed appraisal assignments in the additional states of Georgia, South Carolina, Florida, Alabama, Mississippi, Louisiana, Texas, North Carolina, Tennessee, Kentucky, Virginia, the District of Columbia, Pennsylvania, New York, Illinois, Iowa, Missouri, Nebraska, Nevada, Arizona, New Mexico and California.

## Significant Assignments

| CLIENT | ADDRESS | TYPE | SIZE (SF) |
|--------|---------|------|-----------|
| National REIT | Atlanta, GA | Mixed-Use | 400,000+ |
| CMBS Client | National | Industrial Portfolio | 500,000+ |
| Legal Counsel on LIHTC Foreclosure | St. Louis, MO | Litigation Support | 250,000+ |

## Achievements

Consulting work has included complex assignments for clients such as the city of Boston in the areas of adaptive reuse and redevelopment of historic properties, diminution of value for environmental contamination and utilization of city property.

## Successfully Completed Courses - ROW

*Uniform Standards of Federal Land Acquisitions – McKissock*

*Fundamentals of Uniform Standards of Federal Land Acquisitions – Appraisal Institute*

*Uniform Appraisal Standards for Federal Land Acquisitions: Practical Applications – Appraisal Institute*

*Eminent Domain and Condemnation – Appraisal Institute*

©2023 CBRE, INC.

Fold, Then Detach Along All Perforations

LICENSEE SIGNATURE

# COMMONWEALTH OF MASSACHUSETTS

## DIVISION OF OCCUPATIONAL LICENSURE

BOARD OF

REAL ESTATE APPRAISERS

ISSUES THE FOLLOWING LICENSE CERT

GEN. REAL ESTATE APPRAISER

GARRETT GERSTUNG
47 OAK DR
BEDFORD, NH  03110-6032

1000231

03/17/2026

565563

LICENSE NUMBER

EXPIRATION DATE

SERIAL NUMBER

For: Bob Killion, Enbridge
Date: April 5, 2024
Re: Algonquin Gas Transmission Tree Valuation - Lincoln, MA

On Friday, March 29, 2024. I visited the city of Cambriodge property in Lincoln on Route 2, identified as assessor's map 127, parcel 15.  On that property I measured the trees marked with flagging in the designated work area adjacent to the gas pipeline easement.  The marked trees were labeled with numbers which corresponded to a tree list and a survey map provided by Enbridge.

Methods:  I measured the diameter at breast height (DBH) using a diameter tape, and the merchantable height using a clinometer, for all designated trees 8 inches DBH and greater.  Trees less than 8 inches DBH were determined to have no commercial value.  Merchantable heights were measured to the nearest half-log (a log equals 16 feet).

Trees greater than 10 inches DBH of good form, lacking significant defects or rot, were considered saw logs and were measured for board foot volume.  Trees between 8 and 10 inches DBH, or larger trees not meeting saw log requirements, were measured for cordwood volume.

Board foot volumes were calculated using the International ¼-inch Log Rule.  Cordwood volumes were calculated using the Composite Cordwood Volume Table from the UMass Cooperative Extension Service, *Timber Volume and Conversion Tables for Massachusetts*.

Dollar values were estimated using the latest version of the Southern New England Stumpage Price Survey published by UMass Extension, and the current price sheet from Cersossimo Lumber of Brattleboro, VT.

The table below lists the tree number, species, DBH, Merchantable Height (the number of 16-foot logs), product classification (S=saw log, F=cordwood), board foot or cordwood volume, value per thousand board feet or cords, and total tree dollar value.

Five trees included on the Enbridge list were not measured.  They were either missed or they were mislabeled.  The second table lists these trees with a volume and value estimate determined using the DBH provided by Enbridge and an average merchantable height based on the measured trees.

| ID # | Species | DBH | Merch. Height | Product | BD FT | CD | $/MBF | $/CD | VALUE |
|------|---------|-----|---------------|---------|-------|-----|-------|------|-------|
| 570 | Black oak (Quercus velutina) | 25 | 1 | S | 295 | | $125.00 | | $36.88 |
| 1137 | Black oak (Quercus velutina) | 18 | 1.5 | S | 195 | | $125.00 | | $24.38 |
| 1138 | Black oak (Quercus velutina) | 19 | 1.5 | S | 245 | | $125.00 | | $30.63 |
| 1225 | Black birch (Betula lenta) | 9 | 1 | F | | 0.064 | | $8.00 | $0.51 |
| 1226 | Black oak (Quercus velutina) | 13 | 1 | S | 70 | | $125.00 | | $8.75 |
| 1249 | Black birch (Betula lenta) | 21 | 2.5 | S | 400 | | $100.00 | | $40.00 |
| 1253 | Black oak (Quercus velutina) | 16 | 1 | S | 110 | | $125.00 | | $13.75 |
| 1256 | Black oak (Quercus velutina) | 14 | 2 | S | 135 | | $125.00 | | $16.88 |

| ID # | Species | DBH | Merch. Height | Product | BD FT | CD | $/MBF | $/CD | VALUE |
|---|---|---|---|---|---|---|---|---|---|
| 1259 | Black oak (Quercus velutina) | 17 | 0.5 | F | | 0.142 | | $8.00 | $1.14 |
| 1260 | Black oak (Quercus velutina) | 14 | 1.5 | S | 110 | | $125.00 | | $13.75 |
| 1263 | Pitch Pine (Pinus rigida) | 16 | 1.5 | S | 150 | | $50.00 | | $7.50 |
| 1264 | Black birch (Betula lenta) | 8 | 0.5 | F | | 0.03 | | $8.00 | $0.24 |
| 1275 | Pitch Pine (Pinus rigida) | 19 | 2 | S | 275 | | $50.00 | | $13.75 |
| 1276 | Black birch (Betula lenta) | 11 | 1 | F | | 0.096 | | $8.00 | $0.77 |
| 1280 | Black oak (Quercus velutina) | 26 | 1 | S | 320 | | $125.00 | | $40.00 |
| 1290 | Black birch (Betula lenta) | 9 | 1 | F | | 0.064 | | $8.00 | $0.51 |
| 1291 | Black birch (Betula lenta) | 12 | 1 | F | | 0.115 | | $8.00 | $0.92 |
| 1292 | Black oak (Quercus velutina) | 12 | 0.5 | S | 30 | | $125.00 | | $3.75 |
| 1307 | Black birch (Betula lenta) | 8 | 0.5 | F | | 0.03 | | $8.00 | $0.24 |
| 1308 | Black oak (Quercus velutina) | 15 | 1 | S | 95 | | $125.00 | | $11.88 |
| 1321 | Red maple (Acer rubrum) | 8 | 0.5 | F | | 0.03 | | $8.00 | $0.24 |
| 1325 | Black oak (Quercus velutina) | 20 | 1 | S | 180 | | $125.00 | | $22.50 |
| 1326 | Black oak (Quercus velutina) | 26 | 1 | F | | 0.578 | | $8.00 | $4.62 |
| 1331 | Black birch (Betula lenta) | 14 | 1.5 | S | 110 | | $100.00 | | $11.00 |
| 1332 | Black oak (Quercus velutina) | 20 | 1.5 | S | 270 | | $125.00 | | $33.75 |
| 1333 | Black birch (Betula lenta) | 10 | 1 | S | 40 | | $100.00 | | $4.00 |
| 1335 | Black oak (Quercus velutina) | 16 | 1 | S | 110 | | $125.00 | | $13.75 |
| 1336 | Black oak (Quercus velutina) | 20 | 1 | S | 180 | | $125.00 | | $22.50 |
| 1338 | Black birch (Betula lenta) | 15 | 1.5 | S | 130 | | $100.00 | | $13.00 |
| | | | | | | | | Total | $391.57 |

| ID # | Species | DBH | Merch. Height | Product | BD FT | CD | $/MBF | $/CD | VALUE |
|---|---|---|---|---|---|---|---|---|---|
| 1248 | Black birch (Betula lenta) | 9 | 1 | F | | 0.064 | | $8.00 | $0.51 |
| 1254 | Black birch (Betula lenta) | 8 | 1 | F | | 0.05 | | $8.00 | $0.40 |
| 1257 | White pine (Pinus strobus) | 12 | 1 | S | 60 | | $125.00 | | $7.50 |
| 1258 | Black birch (Betula lenta) | 9 | 1 | F | | 0.064 | | $8.00 | $0.51 |
| 1306 | Red maple (Acer rubrum) | 8 | 1 | F | | 0.05 | | $8.00 | $0.40 |
| | | | | | | | | Total | $9.32 |

Joe Smith
Woodsman, Inc.
1035 Willis Rd.
Phillipston, MA 01331
joesmith@woodsmaninc.com
MA Licensed Forester #224